**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No. 24-2434**

DOLLY DOW, and
VIRGINIA SAKAL, individually and as
representatives of a class of participants and
beneficiaries of the Lumen Combined Pension Plan
f/k/a CenturyLink Combined Pension Plan,

   Plaintiffs,

   v.

LUMEN TECHNOLOGIES, INC.,
LUMEN EMPLOYEE BENEFITS COMMITTEE,
CENTURYLINK INVESTMENT MANAGEMENT
COMPANY,
KATHLEEN M. LUTITO,
STATE STREET GLOBAL ADVISORS TRUST
CO., and
JOHN DOES 1–5,

   Defendants.

---

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

---

1.      Plaintiffs Dolly Dow and Virginia Sakal, individually and as representatives of a

class of similarly situated participants and beneficiaries whose benefit payments were transferred

unlawfully from the Lumen Combined Pension Plan (f/k/a CenturyLink Combined Pension Plan,

the "Plan") bring this action against Defendants Lumen Technologies, Inc. ("Lumen"), the Lumen

Employee Benefits Committee (the "Benefits Committee"), the CenturyLink Investment

Management Company (the "CIM"), and Kathleen M. Lutito (collectively the "Lumen

Defendants"), State Street Global Advisors Trust Company ("State Street"), and John Does 1–5 (together with the Lumen Defendants, "Defendants"), for breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, as amended, 29 U.S.C. §§ 1001 *et seq.*

2.    Congress enacted ERISA and designed the statute to impose strict fiduciary duties and other conduct-regulating obligations upon plan sponsors, administrators, and others, such as to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers. Plan fiduciaries must act "within the statutory parameters of prudence and loyalty," which "impose a fiduciary standard that is considered the 'highest known to the law.'" *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019) (quoting *Donovan v. Bierwirth,* 680 F.2d 263, 272 n.8 (2d Cir. 1982)), *cert. denied*, 140 S. Ct. 2565 (2020). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). That is, fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271 (citing RESTATEMENT (SECOND) OF TRUSTS § 170 (1959), Austin Wakeman Scott, *II Scott on Trusts* §170, at 1297–99 (3d ed. 1967), George G. Bogert, *The Law of Trusts and Trustees* § 543 (2d ed. 1978)).

3.    On or about October 19, 2021, Lumen transferred over $1.4 billion of its pension obligations to either Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively, "Athene"), a highly risky private equity-controlled insurance company with a complex and opaque structure. This transaction affected approximately 22,600 Lumen retirees and their beneficiaries, including Plaintiffs, who depended on Lumen's promise to

guarantee their pension benefits throughout retirement under an ERISA-governed plan. By offloading Lumen's pension obligations to Athene, Defendants caused Plaintiffs and similarly situated Lumen retirees and their beneficiaries to lose their status as "participants" in the Plan, and therefore, Plaintiffs are no longer entitled to ERISA's protections for employee retirement benefits. Although ERISA does not prohibit an employer from transferring pension obligations to an insurance company, since its 1994 amendment, the Department of Labor has consistently stated that ERISA requires a fiduciary to obtain the "safest annuity available" and that ERISA requires an independent fiduciary to recommend the annuity provider with "the highest claims-paying ability willing to write the business." 29 C.F.R. § 2509.95-1.

4.      Defendants did not select the safest possible annuity available to ensure the continued, long-term financial security of Lumen retirees and their beneficiaries. Instead, Defendants selected Athene, whose annuity products are substantially riskier than those of numerous other traditional annuity providers. Athene structures its annuities to generate higher expected returns and profits for itself and its affiliates by investing in lower-quality, higher-risk assets rather than in quality assets that would better support its future benefit obligations. In transferring Plaintiffs' pension benefits to Athene, Defendants put Lumen retirees' and their beneficiaries' future retirement benefits at substantial risk of default without appropriate compensation. Because the market devalues annuities when accounting for such risk, it is also likely that Lumen saved a substantial amount of money by selecting a group annuity contract (or group annuity contracts) ("GAC") from Athene instead of the actual safest annuity available.

5.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain

appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transaction and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), (a)(3), (a)(9).

## JURISDICTION AND VENUE

6.    **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

7.    **Standing.** Plaintiffs have standing to bring this action. Each Plaintiff has suffered injuries traceable to Defendants' conduct. They have been harmed in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan backed by an established, multi-billion-dollar corporation and then placed in the hands of a private-equity controlled insurance company with a highly complex offshore structure and risky asset portfolio. As a result, Plaintiffs are subject to an increased and significant risk that they will cease to receive the benefit payments to which they are entitled. Moreover, any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make. Because Plaintiffs have involuntarily had their retirement benefits exposed to a much higher risk without appropriate compensation, Plaintiffs' retirement benefits are less valuable than they were before they were expelled from the Plan. In addition, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct. These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9).

8.      **Venue.** This District is the proper venue for this action under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because at least one of the alleged acts or omissions giving rise to liability occurred or failed to occur within this District, and at least one Defendant resides, may be found, or regularly transacts business in person in this District.

**PARTIES**

I.      **The Lumen Combined Pension Plan (f/k/a CenturyLink Combined Pension Plan)**

9.      Prior to 1999, CenturyLink, Lumen's predecessor, had multiple pension plans for its legacy employees. One such plan was the Pacific Telecom Retirement Plan (the "PTI Plan"), maintained by CenturyLink for the benefit of Pacific Telecom, Inc.'s employees. On or about January 1, 1999, CenturyLink's employees became eligible to participate in the PTI Plan. Thereafter, the PTI Plan was renamed the CenturyTel Retirement Plan. The Lumen successor plans were renamed multiple times in subsequent years. During 2010, the CenturyTel Retirement Plan was renamed the CenturyLink Retirement Plan, and as a result of additional mergers, was renamed again to the CenturyLink Combined Pension Plan during 2014. Ultimately, on or about November 12, 2020, the CenturyLink Combined Pension Plan was renamed the Lumen Combined Pension Plan (the "Plan").

10.      The Plan is, and at all relevant times was, a defined benefit, employee benefit pension plan pursuant to 29 U.S.C. § 1002(2)(A), (35) covering certain eligible employees of Lumen and participating affiliated companies. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

11.      As of December 31, 2020, before the unlawful transaction at issue, the Plan covered 88,019 total participants and beneficiaries and held $10,584,462,672 in assets.

## II.     Plaintiffs

12.     Dolly Dow resides in Arvada, Colorado and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Dow began her employment with CenturyLink (n/k/a Lumen) in 1981. Over the next 35 years, Ms. Dow worked in CenturyLink's Consumer Department, retiring from her position as Senior Process Analyst in 2014. Ms. Dow began receiving pension payments from CenturyLink in 2014. Ms. Dow began receiving annuity payments from Athene in 2022.

13.     Virginia Sakal resides in Rio Rancho, New Mexico and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Sakal began her employment with Lumen in 1981. Over the next 36 years, Ms. Sakal worked at CenturyLink (n/k/a Lumen), spending her last ten years in the Wholesale Department. She retired from her position as Senior Operations Manager in 2015. Ms. Sakal began receiving third-party annuity payments from Athene in 2022.

## III.    Defendants

14.     Lumen Technologies, Inc., formerly known as CenturyLink, Inc. (NYSE: LUMN) ("Lumen"), is a publicly traded corporation headquartered in Monroe, Louisiana. Lumen is an American telecommunications company offering communications, network services, security, cloud solutions, voice, and managed services. As of December 31, 2022, Lumen employed approximately 29,000 employees and recorded $17.48 billion in annual net revenue. Lumen is the Plan sponsor under 29 U.S.C. § 1002(16)(B). Lumen entered into a commitment agreement with Athene under which the Lumen Defendants agreed to purchase a GAC (or GACs) that would transfer certain of Lumen's pension obligations to Athene. As alleged herein, Lumen exercised discretionary authority or discretionary control respecting management of the Plan, exercised

authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

15.    The Lumen Employee Benefits Committee (the "Benefits Committee") is a Plan administrator under 29 U.S.C. § 1102(a). On information and belief, the Benefits Committee had the authority to manage and control the assets of the Plan. Accordingly, as alleged herein, the Benefits Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

16.    The CenturyLink Investment Management Company ("CIM") is headquartered and incorporated in Denver, Colorado. CIM provides portfolio management, financial planning, and investment advisory services to Lumen's retirement plans. CIM was appointed by the Board of Directors of Lumen to serve as the Plan's the named investment fiduciary for all purposes related to the management and investment of Plan assets. CIM also is a Plan administrator under 29 U.S.C. § 1102(a) along with the Benefits Committee. Among other duties for the Plan, CIM had the authority to appoint and remove trustees, investment managers and other investment-related service providers; enter into agreements; and determine general investment strategies for the Plan's assets. In connection with the annuity transaction at issue, CIM was one of the Lumen Defendants who caused the Plan to purchase the GAC from Athene, thereby transferring Plan participants' retirement benefits to a risky annuity provider. As alleged herein, the CIM exercised discretionary

authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

17.    Kathleen M. Lutito resides in Morrison, Colorado. Ms. Lutito was the President and Chief Investment Officer of CIM until May 2024. In her role, she oversaw all decisions and activities at CIM, including the investment strategy, design, and implementation of Lumen's pension plans, and the annuity transaction at issue. Ms. Lutito was a member of the CIM Board and the CIM Investment Committee, which is responsible for the investment strategies of the Plan. As alleged herein, Ms. Lutito exercised discretionary authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

18.    State Street Global Advisors Trust Co. ("State Street") is a trust company headquartered in Boston, Massachusetts. State Street is a wholly owned subsidiary of State Street Bank and Trust Company. As a wholly owned subsidiary, it was formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. In connection with the annuity transaction at issue, Lumen hired State Street to serve as an independent fiduciary to the Plan, which required, among other things, for State Street to select an annuity provider in compliance with 29 C.F.R. § 2509.95-1. State Street specifically admits that the selection of an insurance provider to annuitize pension plan benefit obligations is governed by that regulation promulgated by the Department of Labor. On information and belief, Lumen and State Street entered into a commitment agreement with

Athene under which the Lumen Defendants agreed to purchase a GAC (or GACs) that would transfer certain of Lumen's pension obligations to Athene. As alleged herein, State Street exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

19.     John Does 1–5 are unknown members of the Benefits Committee who exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, were and are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

20.     Each Defendant is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. §§ 1002(21)(A), 1102(a).

### ERISA'S FIDUCIARY STANDARDS WHEN SELECTING ANNUITY PROVIDERS

21.     ERISA's primary purpose, evidenced expressly by the plain meaning of its textual provisions, is to protect the retirement security of American workers and their beneficiaries, achieving its remedial purposes by, among other things, imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably, the fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1). The statute provides, in pertinent part and with emphases added, that:

> [A] fiduciary shall discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries and –

(A) for the ***exclusive*** purpose of:

    (i) providing benefits to participants and their beneficiaries; and

    (ii) defraying reasonable expenses of administering the plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

22.    The Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1 ("IB 95-1"), setting forth its interpretation of the process a fiduciary is required to undertake in connection with transferring defined benefit pension plan obligations to an annuity provider pursuant to 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9). *See* 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries must take steps calculated to obtain "the safest annuity available." *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

23.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered *per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000) (citing 29 U.S.C. §§ 1002(14)); *see also* 29 U.S.C. § 1106(a)–(b).

## FACTS APPLICABLE TO ALL COUNTS

**I.      Pension Risk Transfers ("PRT")**

24.      "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were the nation's predominant retirement system when ERISA was enacted in 1974.

25.      Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically in the form of a monthly income payment after retirement. Employers are generally responsible for funding the pension plan to pay their benefit obligations to retirees. A formula that accounts for salary and years of service, among other factors, determines the amount of retirement benefits provided to employees.

26.      A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a defined benefit pension plan, the employer (or plan sponsor) bears the risk. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the employee bears the risk of underperformance. If, among other circumstances, investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants, employers must make additional contributions to a defined benefit plan to comply with ERISA's funding requirements.

27.      In recent years, employers have increasingly sought to reduce their pension funding risk through pension risk transfer ("PRT") transactions. In such a transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets

from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

28.    A plan sponsor's process in selecting an annuity provider to which it transfers an employer's pension obligations is a critically important fiduciary function. This decision will have an irrevocable impact on retirees and their beneficiaries for the rest of their lives. As NISA Investment Advisors, LLC ("NISA") noted: it "is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."

29.    PRT transactions can take one of three forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through purchase of an annuity contract;" (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants; or (3) buy-ins, in which the plan continues to issue payments to beneficiaries but from a monthly annuity amount paid to the Plan by an insurer. As discussed below, the Lumen PRT transaction at issue involved a partial buyout.

## II.    The risks associated with PRT transactions.

### A.    Lack of ERISA and PBGC Protections

30.    Participants lose protections under ERISA when their employer transfers its pension obligations to an annuity provider. With few exceptions, ERISA-governed defined benefit plans are covered by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

31.     SGAs are not pre-funded like the PBGC and thus offer substantially less protection compared to the PBGC. SGAs are funded by assessments of member insurers in the case of another insurer's declaring insolvency. SGAs also only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity provider becomes insolvent. In certain states (including California), such an annuitant automatically loses 20%, as some SGAs guarantee a maximum of 80% of the present value of the annuity, up to $250,000.

### B.     Risk of Insolvency and Executive Life

32.     The risk of insurance company failure is not merely hypothetical. The 1991 collapse of Executive Life Insurance Company ("Executive Life") provides a stark look into the potentially catastrophic consequences of high-risk insurance practices. Like the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

33.     As of 1982, Executive Life was one of the Nation's largest insurers and, by 1991, it had attracted over 300,000 policyholders with its A+ credit rating for financial soundness. But, in 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown" before its 1991 seizure by the California Insurance Commissioner. Following the seizure, the California Insurance Commissioner sold Executive Life's portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for approximately half its value. Apollo is the parent company of Athene. Losses to policyholders as a direct result of the Executive Life takeover were extreme, with

13

policyholder damages estimated at $3.9 billion in 1991 (equivalent to approximately $9.1 billion in 2024).

34.    Leon Black was the co-head of brokerage firm Drexel Burnham Lambert ("Drexel"). First Executive Corporation (the parent company of Executive Life of California and Executive Life of New York) was Drexel's largest buyer of junk bonds. Unlike most insurance companies that invested in safer assets such as high-grade bonds, mortgage securities, and government obligations, Executive Life invested in risky junk bonds with high interest rates. Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse. This risky behavior allowed Executive Life to make higher payouts to policyholders in the short-term, but its capacity was short-lived.

35.    By 1990, many of the Executive Life assets used to fulfill annuity payment obligations were in distress and trading for significantly less than their purchase price. When questioned about the risky makeup of its bond portfolio, Executive Life often pointed to its "impeccable" ratings from major ratings agencies, touting an A+ rating from AM Best and an AAA rating from Standard & Poor's.

36.    On April 11, 1991, California Insurance Commissioner John Garamendi seized Executive Life of California because its financial condition posed a threat to its policyholders. Up until a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best, meaning that it was still considered "very good" despite a decline in position pending review. Less than a week later, on April 17, 1991, the New York insurance regulator seized Executive Life of New York. From there, it took only weeks for parent company First Executive to file for bankruptcy protection. With the help of ratings agencies, Executive Life obscured the true riskiness

14

of its bond portfolio, and hundreds of thousands of pensioners lost the vested financial security in retirement that their former employers had promised them in exchange for years of dedicated service.

37.     Executive Life was ultimately declared insolvent in 2012. In August 2013, the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. Many annuitants lost 50% or more of their annuity payments. The Executive Life Restructuring Agreement provides that GABC is expected to make reduced annuity payments to Executive Life annuitants for another 50 years.[1]

### C.     Response to Executive Life and Interpretive Bulletin 95-1

38.     In response to Executive Life's collapse and its impact on hundreds of thousands of American retirees, and in order to prevent similar crises in the future, Congress passed the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401, 108 Stat. 4172 (Oct. 22, 1994) (codified as amended 29 U.S.C. §§ 1132(a)(7), 1132(a)(8), 1132(a)(9), 1132(*l*)(3)(B)), as an amendment to ERISA. Through this amendment, ERISA now expressly provides that plan participants and beneficiaries ejected from the federal pension regulatory system by a plan sponsor's "purchase of an insurance contract or insurance annuity" have a private right of action for appropriate relief, including, but not limited to, "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

39.     On March 6, 1995, the Department of Labor promulgated IB 95-1, which establishes a framework for ERISA compliance when choosing an annuity provider in a PRT

---

[1] *See* Agreement of Restructuring in Connection with the Liquidation of Executive Life Insurance Company of New York (Apr. 23, 2023), and Schedule 1.15 (List of Contracts).

transaction. The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." Fiduciaries must "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities."

40.    To determine the safest available annuity, IB 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and the guarantees supporting them; and (6) the availability of additional protection through SGAs. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to evaluate these factors properly.

**D.    Private Equity Firms**

41.    Since Executive Life's collapse, the PRT market has been dominated by traditional annuity providers, including New York Life Insurance Company ("New York Life"). But more recently, private equity firms have assumed a growing role in the PRT landscape both through purchasing life insurers and through serving as their third-party asset managers.

42.    The mission of private equity does not align with the interests of annuitants. While private equity firms began by purchasing insurance companies to finance operations, today they have moved beyond this business into the lines of private credit and insurance. Not only are private equity firms able to invest cash from premiums into their other affiliated businesses, they can also

16

generate enormous investment management fees for themselves. They focus on maximizing their immediate financial returns instead of ensuring receipt of the guaranteed pension benefits due to their annuity beneficiaries.

43.    The United States Department of the Treasury expressed concerns of the potential misalignment between "the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests." The Department of Labor also conducted a review of IB 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans. During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

44.    As of 2023, private equity firms spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015. Lawmakers and industry experts are also concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the National Association of Insurance Commissioners ("NAIC") expressing concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."

45.    The increased use of complex investment strategies has led to the greater prominence of illiquid and volatile assets in the insurers' portfolios, which is in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk,

high-yield investment strategies allow private equity-owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem attractive.

### III.     Athene and its financial risks.

46.     Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. and was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company that conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity and Life Company and Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

47.     On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. Apollo was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered into bankruptcy (causing the collapse of Executive Life). At the time of the merger, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its PRT liabilities are reinsured through Bermuda-based affiliates owned by Athene's parent, Apollo.

### A.     Athene's complex investment structures and ratings.

48.     Athene's use of complex investment structures subject to lax regulatory standards has contributed to its high level of risk as an annuity provider. Athene has established two offshore captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both of which

are headquartered in Hamilton, Bermuda. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero.

49.    For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and Collateralized Loan Obligations ("CLOs"), even though some CLO tranches have greater downside risk than bonds with the same credit rating. According to Federal Reserve Board economists, insurance companies like Athene, hold some of the riskiest portions of the CLOs issued by their own affiliated asset managers. Athene has a higher-than-average investment in CLOs, and as of September 30, 2023, approximately 35% of its $20.6 billion of CLOs was in one prominent market reporter's unfavorable BBB category, a higher concentration than that of most other U.S. life insurers.

50.    Annuity and life insurance companies maintain surpluses to ensure long-term solvency. An insurer's surplus, or the difference between its assets and liabilities, acts as the only barrier between solvency and insolvency. To ascertain whether an insurer is able to pay out policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities. In the wake of the recent surge in life insurer liabilities and annuity sales spurred by PRT transactions, some life insurers backed by private equity report extremely small surpluses relative to the risk profile of their assets in their portfolios.

51.    As of year-end 2023, Athene's surplus stood at only 1.44%. In contrast, a traditional insurer, New York Life, maintained a surplus-to-liability ratio of 12.24%. The national average is over 7%. Athene's surplus-to-liabilities ratio is staggeringly low when compared to that of its peer insurers and, as such, annuitants whose pensions have been transferred to Athene are at a

significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

52.    Athene touts an ample surplus, but this is misleading. When Athene discusses its surplus, it refers only to that of Athene Holding Ltd., the parent holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which as discussed *supra*, is among the thinnest in the country. Athene's total liabilities also increased by more than 250% from 2018 to 2023. However, the amount of surplus maintained to support Athene's liabilities has not increased at the same pace. A diligent and thorough investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider.

53.    Athene also has a high concentration of risky assets relative to its surplus. For 2022, Athene reported $21 billion in "other loan-backed and structured securities" compared to only $2 billion in surplus. New York Life, on the other hand, reported $11.7 billion for those securities, which was significantly less than its $23.88 billion surplus.

54.    Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, in the event of a market downturn, Athene may experience a liquidity crisis to satisfy its pension obligations. As a result, Athene has overstated its actual liquidity, further contributing to the risk assumed by annuitants.

55.    Financial entities that combine U.S. life insurers (Athene), offshore captive reinsurers (Athene Life Re), and asset managers (Athene Asset Management) employ what is called a "Bermuda Triangle Strategy." The insurer (*e.g.,* Athene) firsts builds a block of annuity

business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer (*e.g.,* Athene Life Re), thereby freeing up capital for its private debt business. The affiliated asset manager (*e.g.,* Athene Asset Management) then originates, acquires, and manages private debt.

56.    Bermudian reinsurers issue financial statements under Bermuda accounting standards rather than under the United States Statutory Accounting Principles ("U.S. SAP"). Under U.S. SAP, insurers are required to file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock and bond purchases and sales by unique identifier for registered securities. By contrast, in Bermuda, Athene's affiliated reinsurers report only aggregate data without individual purchases or sales. Bermuda also allows insurers to invest in assets that would not qualify as suitable under U.S. SAP. According to the U.S. Insurance Guide, "SAP is focused on measuring a reporting entity's ability to pay future claims, while GAAP is more focused on measuring earnings." Under SAP, assets are valued conservatively, and liabilities are recognized when incurred.

57.    Moody's recently stated that the movement of reinsurance offshore is "a credit negative for the life insurance sector." A state insurance regulator in Minnesota, who is also an NAIC actuary, voiced concerns with offshore reinsurance because compared to reserves regulated by U.S. SAP, offshore "reserves are substantially lower, disappear, or can even be negative." According to the assistant commissioner of New Jersey's Office of Solvency Regulation, "the level of policyholder protection may be declining" because of the increased use of offshore reinsurance. He also stated that the "ability to greatly reduce reserves appears to be one of the main drivers of

the offshore reinsurance boom." Further, when states conduct periodic examinations of insurance companies, these examinations do not even consider offshore reinsurers that are often under-reserved.

58.    While reinsurance with a third-party reinsurer can increase protections for policyholders, the same is not true of offshore affiliated reinsurance. Instead of reinsuring through a third-party reinsurer to diversify risk, Athene "cedes" reinsurance to captive affiliates. As of year-end 2023, Athene reported over $15 billion in assets reinsured with affiliates. Athene's total liabilities reinsured by captives totaled over 5,000% of its surplus.

59.    Beyond traditional reinsurance, Athene engages in significant Modified Coinsurance ("ModCo") transactions that further disguise its true risk level. ModCo is a type of reinsurance. In ModCo transactions, an insurer (the ceding carrier) transfers regulatory capital requirements associated with its asset risks to a reinsurer while retaining the assets themselves. In 2022, Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in surplus. For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only $2.9 billion in surplus. In contrast, other insurers, such as New York Life, reported no ModCo with offshore affiliates in 2022 and 2023.

60.    Conducting ModCo transactions with Bermuda-based captive reinsurers like Athene simply involves swapping insurance risks among commonly controlled companies for the purpose of avoiding U.S. SAP requirements and artificially inflating Risk-Based Capital ("RBC") ratios. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. RBC ratios are inflated because ModCo arrangements allow Athene to remove risky assets from its RBC ratio. And the use of higher-risk

22

assets enables Athene to value its liabilities at a lower rate. In offloading capital requirements and asset risks to a captive reinsurer through an ultimately circular ModCo transaction, Athene obscures the actual risks associated with the assets involved and is enabled to maintain a lower level of surplus.

61.     The interdependence among Athene and its in-house, Bermuda-based reinsurers reporting under Bermudian standards exposes each of these entities to a heightened risk of failure. Should Athene's separate account and then general account be insufficient to cover its liabilities, Athene would be forced to seek payment from its affiliated reinsurer for a portion of its annuity liabilities.

62.     These closely correlated events are tied to Athene's weak financial condition relative to other insurers. As shown through its thin surplus and dramatic increase in liabilities, Athene is dramatically under-reserved relative to peers. In a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurers, in other words, itself. Furthermore, an inability to satisfy Athene's general account obligations would cause a downgrade in its credit, preventing it from raising funds in the credit markets.

63.     Because Athene houses most of its business in Bermuda, its holding company, Athene Holding, Ltd., primarily relies on dividends from its Bermudian operating companies. To complicate this structure further, Athene Holding, Ltd. is not a pure insurance holding company. It is part of Apollo, which has a large asset management business in addition to Athene's insurance operations.

64.     An analysis of Athene's transfer activity among affiliates further illustrates the heightened risk of Athene due to the interdependence among captive affiliates. Athene Annuity Re

Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If only a fraction of that reinsurance transferred in 2021 was disallowed, Athene would face a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene-affiliated insurance companies represent 40% of Apollo's value.

65.     Athene claims to have a "separate account" to pay Plaintiffs and other similarly situated Lumen retirees and beneficiaries their benefit payments. But, on information and belief, this separate account is not truly "ring-fenced" or insulated from Athene's general liabilities. According to GACs issued by Athene for other PRT transactions, the separate account not only holds assets supporting the contract, but assets in the separate account may also be used to support Athene's payment obligations under other, separate GACs issued by Athene. Periodically, Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

66.     Apollo has specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies: "[s]uch PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities[.]" Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

67.     Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. The provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was

acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

**B.      Athene's creditworthiness and risky offshore practices.**

*1.      Objective measures illustrate that Athene was not the safest annuity available.*

68.     On October 13, 2022, NISA reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene.[2] NISA performed its evaluation consistent with the framework outlined by IB 95-1. The report found, among other things, that PRT transactions issued by lower-quality annuity providers harm annuitants by as much as $5 billion annually through uncompensated credit risk.

**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

69.     To perform the evaluation, NISA computed the credit spread differences "between insurers into the implied cost that beneficiaries bear to individual insurance companies," finding

---

[2] David Eichorn, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA Investment Advisors, LLC (2022), https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

"the range of credit risk costs reaching as high as 14%." As shown above NISA quantified the economic loss to beneficiaries due to credit risk, placing Athene dead last among annuity providers. The NISA report demonstrates that Athene is a much riskier annuity provider than traditional options.

70.    Other objective measures from the NISA report further illustrate that Athene was not the safest available annuity provider. The bond market uses spread to measure the creditworthiness of bonds issued by insurers because there is an inverse relationship between spread and credit rating. As seen in the chart, Athene had the highest reported spread of 214 basis points ("bps"). Accordingly, all else equal, an investor demands additional compensation for taking on more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. But annuitants in a PRT transaction are unable to secure additional compensation for assuming higher risk from a low-quality annuity provider like Athene.

71.    Further, Athene was classified by NISA as a "Questionable Candidate" whose selection "demands extenuating circumstances" when assessing whether Athene was among the safest annuity providers in the market. The reported market spread, market price for risks assumed, and the economic loss to annuitants are all significantly higher than the same measures for other annuity providers, including New York Life. At least three providers were found to be "Clear Candidates" for an annuity provider in a PRT transaction. Among annuity providers examined, Athene cannot be considered the "safest available" annuity.

72.    IB 95-1 makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an

appropriate annuity provider." In light of this guidance, NISA separately compared the agency rating of Athene to the market-adjusted implied rating.



73.    The reported range above is the median between the ratings reported by established rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc. ("Moody's"), and Fitch Ratings ("Fitch").

74.    NISA found that although Athene had an agency rating of A+, its implied rating was BBB-, the lowest rating among all reported annuity providers. Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate whether Athene offered the safest annuity available.

75.     Athene touts its safety based on its A+ credit rating, but this is misleading. There are multiple levels of safety above A+, including AA and AAA. Insurers with greater creditworthiness maintain these comparatively higher credit ratings. These differences in credit ratings correspond to insurers' likelihood of default.

76.     For instance, Athene maintains an A rating issued by Moody's, in contrast to New York Life's Moody's-issued AAA. Moody's reported average cumulative issuer-weighted default rates based on these credit ratings from 1970 through 2021, and the differences are stark. Over a 20-year time horizon, which is likely an even shorter horizon than would be relevant to the obligations to many pensioners, riskier insurers' default rates become apparent. While Moody's AAA ratings default at a rate of 0.7%, the default rate for its A ratings is almost *seven* times higher at 5.0%. It can be expected that if extended to a 30-year time horizon, this differential would grow exponentially.

### 2.     *Even if insurance rating services' opinions were dispositive, Athene was not the safest available annuity provider.*

77.     On October 6, 2023, New York Life received among the highest credit ratings based on its leading market position, its diversified portfolio and extremely strong capital levels. But on the same date, Athene received much lower ratings. Because of Athene's non-traditional asset mix, Athene likely would experience realized losses in a stressed market environment. Athene's ratings were skewed because of a lack of transparency into its offshore captive reinsurance affiliates in Bermuda. Athene's offshore captive reinsurance scheme also allows Athene to access third-party capital to support both organic and inorganic growth. If Athene ceded any business to its offshore captive reinsurance affiliates, any underperformance of that ceded business would most likely lead

to Athene's undercapitalization, as Athene ultimately remains liable for honoring the obligations underlying the ceded business.

78.     On November 17, 2023, New York Life received a very high rating based on its ability to pay its claims and repay its obligations promptly. New York Life's overall governance model is grounded in its mutual ownership structure, prioritizing conservative risk and governance practices. New York Life is strongly committed to its policyholders, writing business in which risks are borne by both New York Life and its customers—and in which customers are compensated for that risk in the form of dividend payments. Additionally, New York Life's management is dedicated to its policyholder-oriented principles, which are aligned with the interests of New York Life's other creditors. In contrast, on July 17, 2023, Athene received a much lower rating because: (1) Athene's portfolio has an unusually high concentration of senior and subordinated structured assets (like ABS and CLOs) compared with other similarly rated insurance peers, which could jeopardize Athene's solvency in the event of an interest rate hike; and (2) Athene's rapid expansion into pension risk transfers has increased Athene's asset and liability management risk (*i.e.*, a mismatch between liabilities due and assets on hand to pay those liabilities).

### 3.    *Athene relies on unreliable private letter ratings.*

79.     Athene depends on "private letter ratings" from smaller private credit rating agencies. These private rating agencies apply less stringent standards for ratings than public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies. There are significant discrepancies among securities ratings provided by private ratings agencies—Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and

Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

80.     In 2019, the Wall Street Journal ("WSJ") reported the same discrepancies among structured security ratings, including CLOs: smaller private rating agencies were more likely to provide higher grades than the major ratings agencies on the same bonds. This resulted in the classification of a bond as "junk" by major rating agencies whereas the smaller, private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. Private letter ratings that carry a higher credit rating than the SVO designation, for example, result in lower RBC requirements, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolio.

81.     Both KBRA and DBRS have been the subject of investigations by the SEC regarding their rating practices, resulting in millions of dollars in fines. One investigation unveiled that KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio.

### 4.    Athene has been the subject of investigation by insurance regulators.

82.    Athene has been investigated by the State of New York for misconduct regarding its PRT business and was found to have violated New York law. Relative to other states, New York state maintains some of the strictest standards on insurers. In January 2019, the New York Department of Financial Services investigated Athene Annuity and Life Company and Athene Holding Ltd., concluding that Athene Annuity and Life Company violated New York law by transacting insurance business related to its PRT business without a license from the State. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were jointly ordered to pay a $45 million civil penalty and satisfy other conditions. These other conditions included, among other things, prohibiting Athene Annuity and Life Company from soliciting, negotiating, selling, or servicing any PRT transactions, group annuity contracts, or related certificates in New York except through its subsidiary, Athene New York.

### IV.    State Street was not independent because it has been a major shareholder of Lumen since 2019, and was a major shareholder of Apollo.

83.    State Street and its affiliates have held substantial ownership of Lumen's common securities since 2007, consistently holding more than five percent of all of Lumen's outstanding, publicly traded equity securities for most years since 2014. Holders of publicly traded securities are entitled to vote on matters affecting corporate governance, including members of the board, shareholder resolutions, and the like. According to SEC rules, any person who acquires a beneficial ownership interest of more than five percent of certain classes of certain equity securities must file a Schedule 13 annually with the SEC to ensure that investors and the market have accurate information about potential changes in corporate control. Given these requirements and State Street's significant ownership interest in Lumen, State Street was required to file Schedules 13

concerning its Lumen holdings for all years between 2014–2023, inclusive, except 2018, for which State Street did not file such a Schedule for its Lumen holdings.

84.    From 2014 through 2017, State Street held between 30.5 million and 51.1 million common Lumen shares, an ownership interest ranging between 4.8% and 5.8% of Lumen, valued between approximately $734.1 million and $1.3 billion (*i.e.*, between approximately $961.0 million and $1.7 billion in 2024 dollars). From 2019 through 2023, State Street held between 53.1 million and 61.5 million common Lumen shares, an ownership interest ranging between 5.2% and 6.0% of Lumen, valued between approximately $97.3 million and $797.4 million (*i.e.*, between approximately $100.3 million and $979.92 million in 2024 dollars).

85.    State Street is also one of the largest shareholders of Apollo. As of mid-year 2022, State Street was the sixth largest institutional investor in Apollo, owning 8.9 million shares valued at $437 million. And as of December 31, 2023, State Street was the seventh largest institutional investor of Apollo, owning 10.31 million shares valued at $1.1 billion. State Street also provides custodial services for Athene insurance products.

86.    Because State Street held such significant positions in Lumen and Apollo, it had a self-interest in increasing the value of its equity positions in both companies. State Street had an interest in favoring Lumen by selecting an annuity provider that provided reduced premium payments relative to established and reputable insurance providers, thereby providing a direct financial benefit to Lumen and its shareholders. Like most publicly traded companies, Lumen holds an annual shareholders' meeting at which its shareholders, including State Street, are entitled to vote on a wide range of corporate strategic and governance issues, including those relating to the appointment, composition, and pay of board members. Shareholders, including proxy

shareholders, generally receive ballots each year that also include proposals for strategic investments. State Street's significant holdings in Lumen's common stock before, during, and after the October 2021 PRT gave State Street the ability to influence Lumen's strategies and activities.

87.    Studies show that large shareholders (like State Street) have an incentive to provide favorable advice for the management of public companies that are their clients (like Lumen) than for others that are not, and such incentives often exist where, as here, there is a side-agreement between the large shareholder and the public company at issue. Public companies (like Lumen) are incentivized to buy products and services from their large shareholders (like State Street) so that the large shareholders maintain or increase their ownership positions. These relationships incentivize large shareholders to exercise their proxy voting power to favor management-friendly resolutions. Therefore, State Street did not act as an "independent" fiduciary with respect to the October 2021 PRT transaction. Instead, State Street's interests were directly aligned with the Lumen Defendants' and Athene's: to maximize profit, even if this meant choosing an annuity provider that did not offer the safest annuity product available and did not have the highest claims paying ability.

**V.    Lumen's business dealings with Apollo and the subsequent Lumen-State Street-Athene PRT in October 2021.**

88.    On August 3, 2021, Lumen announced that it had entered into an agreement with Apollo and Apollo's affiliates, pursuant to which Apollo and its affiliates would acquire Lumen's Local Incumbent Carrier assets and operations in 20 states for $7.5 billion. The deal was completed on October 3, 2022. The transaction was one of two divestitures designed to help Lumen rebound from a long string of financial struggles and return to financial growth.

89.    The National Digital Inclusion Alliance ("NDIA"), Public Knowledge, and the Communication Workers of America ("CWA") expressed significant concerns with the deal, including concerns over the lack of "mandatory and enforceable transfer conditions that address fiber investment, legacy service maintenance, [and] employee and plant retirement" that would address potential public interest harms. CWA cited, as a precautionary example, Apollo's 2016 takeover of Warrior Met Coal. In that takeover, Apollo "devastated the company's workforce by cutting pay, benefits, and terminating collective bargaining and pension agreements" while at the same time taking on "massive debt while distributing huge dividends to investors." In fact, at the time the Lumen/Apollo transaction was announced, Warrior Met Coal workers were four months into a strike to restore wages, benefits, and fair work processes that they had lost while Warrior Met Coal owners, and primarily Apollo, enjoyed $1.4 billion in dividends. Lumen chose to prioritize its shareholders and its bottom line while its workers feared what could become of their job and financial security.

90.    On October 29, 2021, Lumen announced to its shareholders that, ten days earlier, on October 19, 2021, Lumen, "as sponsor of the [Plan] . . . along with the Plan's independent fiduciary, entered into an agreement" to effectuate a pension risk transfer of "approximately $1.4 billion of the Plan's pension liabilities." There was an irrevocable transfer of "future Plan benefit obligations for approximately 22,600 U.S. Lumen participants in payment . . . effective December 31, 2021." The transaction was funded "entirely by existing Combined Plan assets." "The final reconciliation process was completed in May, 2022," and Lumen's Form 5500 for 2021 reflected "a refund to the Combined Plan of $13.9 million," recorded in "Other Receivables."

91.     The Lumen Defendants appointed State Street as the independent fiduciary charged

with choosing an annuity provider for the October 2021 PRT transaction, thereby assisting Lumen

in offloading its pension liabilities. At all relevant times, State Street represented that its services

include "[i]nsurance provider selection for annuitizing defined benefit plans (in accordance with

the Department of Labor's Interpretive Bulletin 95-1)[.]" A key service offered by State Street's

Independent Fiduciary Services team—and, according to State Street, one of the leading "reasons

why companies decide to hire" purportedly independent fiduciaries like it—is that State Street's

role as a third-party and allegedly "neutral" advisor "may help in the event of litigation."[3] But as

indicated *supra,* State Street did not act as a neutral advisor on behalf of Lumen retirees and their

beneficiaries.

92.     As referenced in Lumen's shareholder announcement, Lumen, acting on State

Street's advice, entered into an agreement with Athene on or about October 19, 2021. Through the

agreement, Lumen purchased the GAC from Athene in exchange for Athene assuming

approximately $1.4 billion of the Plan's defined benefit pension obligations. The GAC covers

approximately 22,600 Plan participants and beneficiaries, none of whom had any say in the transfer

of their benefits to Athene.

93.     On August 19, 2022, shortly after the PRT at issue, the Federal Communications

Commission approved the August 2021 Lumen-Apollo agreement pursuant to which Lumen also

---

[3] STATE STREET GLOBAL ADVISORS, *DC DNA: How Independent Fiduciary Services Evolved
and What It Means Today* (State Street Corp., Oct. 31, 2023),
https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-
evolved/.

received $7.5 billion from Apollo, Athene's parent, when Lumen ceded its operations in 20 U.S. states to Apollo and its affiliates.

94.    Athene is now solely responsible for paying the pension benefits of the Plan participants and beneficiaries covered by the transaction, who are no longer subject to ERISA's protections for employee benefits. Affected pensioners are those whose monthly payments are less than or equal to $1,070 per month and whose payments from Lumen began on or before June 1, 2021. Following the PRT transaction, Athene began making annuity payments to Lumen pensioners and their beneficiaries on or after December 31, 2021.

95.    As a result of the transaction, the value of the annuity benefits Plaintiffs are now receiving from Athene is substantially less than the value of the pension benefits they were receiving, and were entitled to receive, from Lumen. Even though Lumen retirees had no ability to choose their annuity provider, they cannot withdraw their benefits. Athene's obligations are irrevocable. Thus, pensioners with a lower risk appetite did not have the option to transfer their benefits to a safer, less risky alternative.

**VI.    Defendants acted in their own self-interest in selecting Athene.**

96.    Defendants violated their strict fiduciary duties by selecting, and then causing the offloading of billions of dollars of Plan participants' retirement benefits to Athene. They placed their own monetary interests ahead of Plaintiffs' interests and those of other similarly situated Lumen retirees and beneficiaries and failed to conduct a thorough and independent investigation of available annuity providers for the Plan. Relative to traditional annuity providers, Athene is far riskier.

97.     In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of dollars in participants' retirement benefits to Athene. There were numerous factors that would and should have led a fiduciary to conclude that Athene was not the safest annuity provider available: (i) Athene lacks a sufficient track record to guarantee pension liabilities; (ii) Athene invests in riskier assets; (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene, which are regulated by Bermuda standards, not by U.S. SAP; (iv) Athene overvalues its assets and understate its liabilities; (v) Athene uses excessive amounts of ModCo to artificially inflate its RBC ratio; and (vi) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

98.     When advising the Lumen Defendants to offload their pension obligations to Athene, State Street was held to the same stringent fiduciary standards as the Lumen Defendants owed to the Plan. State Street selected or recommended Athene as the annuity provider in the PRT in violation of its obligations as an independent fiduciary to the Plan. At all relevant times, State Street's role in PRT transactions has been critical to Athene's success. For 2021, the Lumen and State Street's PRT represented approximately 14% of Athene's sales, or $1.4 billion of the $10.1 billion Athene reported for pension group annuity sales. Given the corporate relationships between State Street, Athene and Athene's affiliates, and the numerous factors that would have led a prudent fiduciary to reject Athene as an annuity provider, it is evident that State Street selected or recommended Athene without conducting an objective evaluation of available annuity providers or, alternatively, after ignoring the risks posed by Athene.

99.    The risks posed by Athene in 2021 and years prior would have been known and readily ascertainable to any prudent and loyal fiduciary. Without conducting an independent, impartial investigation aimed to identify the safest annuity provider with the highest claims-paying ability available, Defendants did not and could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of Plaintiffs and similarly situated Athene retirees.

100.    Although the Lumen Defendants ostensibly hired State Street as an independent fiduciary to select Athene, the Lumen Defendants maintained full responsibility as appointing fiduciaries to monitor State Street to ensure that it carried out its fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective action to protect the plan and its participants when the delegate fails to discharge its duties. The Lumen Defendants also had a duty to prevent any fiduciary breach by State Street in the selection of Athene as the annuity provider and to ensure that State Street was performing its delegated tasks in accordance with ERISA's fiduciary standards. The Lumen Defendants failed to prudently discharge their fiduciary duties in monitoring State Street.

101.    In the PRT industry, plan fiduciaries customarily solicit competitive bids from insurers to ascertain whether a proposed transfer is in the best interest of the plan participants. Given the extensive information available to Defendants that would have led a prudent fiduciary to reject Athene given its abominable creditworthiness and other deficiencies, it is evident that Defendants either did not solicit bids from a large number of providers and/or did not engage in an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Without such a reasoned, prudent, and objective decision-making process,

Defendants could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of the Plan's participants and beneficiaries. Had Defendants engaged in the deliberative process that ERISA mandates, Defendants would have known that Athene was not the safest available annuity provider, and they would not have placed Plaintiffs' pension benefits and future retirement income payments at substantial risk of Athene's insolvency, incapacity, inability, or other unwillingness to perform.

102.    Defendants' decision to use Athene as the annuity provider harmed, and will continue to harm, Plaintiffs and other similarly situated Lumen retirees and beneficiaries over an extended period of time through uncompensated risk. The market measures Athene as up to 14% riskier than traditional annuity providers. Investors in the market demand a risk premium to compensate them for exposure to higher risk. But here, Plan participants and beneficiaries receive no additional compensation for taking on the additional risk of having their pension benefits offloaded to Athene.

103.    IB 95-1 instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." On information and belief, the Lumen Defendants received an economic benefit from choosing Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life. Even if Athene's pricing had not been more favorable to Lumen than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with IB 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity provider available.

104.     As the number of PRT transactions has dramatically increased due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the significant role of fiduciaries to ensure that low bidders are not taking undue risks. This wider range in premiums is shown below:



105.     Other sources confirm the trend of employers in PRT transactions selecting the lowest cost annuity provider. Among partial buyouts completed in 2022, Aon reported that employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. As previously noted, the transaction at issue was a partial buyout.

106.     The Lumen Defendants' decision to choose State Street as an independent fiduciary for the Plan was itself a separate breach of the Lumen Defendants' fiduciary duties under ERISA. The Lumen Defendants had a motivation to favor State Street, one of Lumen's largest shareholders, in order to financially benefit themselves from the PRT transaction. State Street had the opportunity to use its significant market power to influence proxy voting outcomes to align with

Lumen management on Lumen's shareholder resolutions. The Lumen Defendants had no interest in conducting an impartial investigation of available independent fiduciaries for the Plan.

107.    Accordingly, the Lumen Defendants either failed to engage in a thorough, independent investigation of available independent fiduciaries for the Plan, or ignored the results of such investigations, in express contravention of the duty to act solely and exclusively for the benefit of Plaintiffs and similarly situated Lumen retirees. Had the Lumen Defendants conducted an impartial investigation, they would have discovered that State Street was conflicted through its business dealings with Apollo and Athene, which impacted its ability to render independent fiduciary services.

## VII.    The PRT transaction diminished the value of Plaintiffs' pension benefits and substantially interfered with Plaintiffs' future payment rights.

108.    The PRT transaction with Athene immediately diminished the present value of Plaintiffs' and other similarly situated Lumen retirees and beneficiaries' pension benefits. In the investment industry, risk is weighed by the market to determine the value of bonds or annuities. For a bond, the higher the risk, the greater return or spread required by the market. As such, if an annuitant receives the same payments, but from a less creditworthy issuer, the annuitant experiences a loss. This is because the market assigns a lower price for an annuity issued by a riskier provider to cover a similar stream of future payment obligations to compensate the annuitant for the additional risk of future loss. The price (*i.e.*, present value) of future annuity payments is determined by the rate of return or discount rate. The higher the discount rate to compensate an annuitant for assuming additional risk of loss, the lower the present value of the annuity.

109.    As of October 19, 2021, the value of Lumen retirees and beneficiaries' pension benefits and rights of future retirement payments is substantially less than it would be had Defendants selected a more traditional, reputable, and stable annuity provider instead of Athene. If the Athene GAC at issue here were offered on the open market alongside traditional issuers' annuity products with identical terms and for the same price, then any rational retirement investor would choose any one of the traditional issuer's annuity products and would not choose Athene's. Alternatively, a rational retirement investor would insist on paying a lower price for the Athene-issued annuity, as its present value is substantially less than that of most other traditional, reputable, and stable annuity products. The diminution in present value of Plaintiffs and similarly situated Lumen retirees and beneficiaries' pension benefits as a result of Defendants' wrongful acts and omissions is substantial.

110.    For instance, the Athene 10- and 20-year annuities had a higher credit spread relative to U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. Thus, a higher-risk annuity is worth measurably less than lower-risk annuities offered by creditworthy issuers because annuitants are not compensated for the additional risk they assume.

111.    Because of the transaction, Plaintiffs are no longer members of the Plan, and their retirement benefits are not protected under ERISA. The PRT transaction thus greatly increased the risk—and indeed introduced a substantial risk—that Plaintiffs will not receive the retirement benefits they earned and are owed. Defendants' selection of Athene injured Plaintiffs the very moment the transaction was consummated.

112.    Had Defendants not engaged in the acts and omissions alleged to be unlawful herein, Plaintiffs would not have been injured because: (1) the present value of their pension benefits (including the right of future retirement income payments) would not have been substantially diminished; and (2) even if Lumen had at some point in the future become unable or unwilling to honor its obligations, the PBGC would have served as the backstop to mitigate Plaintiffs' losses.

## CLASS ACTION ALLEGATIONS

113.    Plaintiffs seek class action certification on behalf of all participants in the Lumen Combined Pension Plan (f/k/a CenturyLink Combined Pension Plan) and their beneficiaries since October 19, 2021, for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

114.    This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a.    The proposed class includes approximately 22,600 members and is so large that joinder of all its members is impracticable.

b.    There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate remedy for any violation.

c.      Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plan and were subjected to Defendants' conduct in transferring Lumen's benefit payments to the Athene entities.

d.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action, have engaged experienced and competent attorneys to represent the class, and have no conflicts of interest with members of the proposed class.

e.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

f.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

g.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a

class action is superior to individual actions or other methods of adjudication. Given the
nature of the allegations and Defendants' common course of conduct to the class as a whole,
no class member has an interest in individually controlling the prosecution of this matter,
and Plaintiffs are aware of no difficulties likely to be encountered in the management of
this matter as a class action.

115.    Plaintiffs' counsel, Schlichter Bogard LLP, will fairly and adequately represent the
interests of the class and is best able to represent the interests of the class under Rule 23(g). The
firm has extensive experience in the area of ERISA fiduciary breach litigation and has been
appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is
recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v.
Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at \*4–5 (S.D. Ill. July 17,
2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist.
LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been
featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other
media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST.
J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29,
2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd
Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo,
*Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz
Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18,
2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark
Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1,

45

2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct.
2, 2014).

## COUNT I

### Breaches of Fiduciary Duty against all Defendants Regarding Athene

116.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

117.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plan
and transactions at issue.

118.    As such, Defendants were required to discharge their duties with respect to the Plan
"solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's
participants and beneficiaries and defraying reasonable expenses of administering the Plan, and
"with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent
man acting in a like capacity and familiar with such matters would use in the conduct of an
enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

119.    IB 95-1 sets forth the Department of Labor's view of the legal standard imposed by
§ 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection
with a pension risk transfer. 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties
to act solely in the interest of participants and for the exclusive purpose of providing benefits,
fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling
the duty of prudence requires an objective, thorough, and analytical search for an annuity provider.

120.    Defendants breached their duties of prudence and loyalty. Based on objective
criteria and relative to other providers in the market for plans of the character and size of the Plan,
Athene was not the safest annuity available. On information and belief, Defendants selected

Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving Lumen money and enhancing corporate profits. State Street was conflicted, and its selection or recommendation of Athene was influenced by its relationships with Lumen, Athene, and Athene's affiliates rather than being the result of an objective and thorough independent investigation into the merits of whether Athene was the safest annuity provider available. In so doing, Defendants breached their duty of loyalty by favoring their own corporate interests over Plan participants' interests in a secure retirement. Because the Lumen Defendants' goal and motivation was to save Lumen money, and State Street's goal and motivation was to benefit itself and its corporate partners, Defendants' search was biased in favor of the lowest-cost provider and thus was not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

121.    The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

122.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings realized by Defendants by virtue of purchasing Athene annuities instead of the safest possible annuities and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

123.    Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

## COUNT II

**Knowing Participation in Fiduciary Breaches against the Lumen Defendants**

124.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

125.    An individual whose status as a participant or beneficiary is terminated in a plan through the purchase of an insurance contract or annuity may bring an action to obtain appropriate relief when such purchase constitutes a violation of 29 U.S.C. § 1104. Section 1132(a)(9) places substantive duties on certain nonfiduciaries and imposes liability on nonfiduciaries who knowingly participate in a fiduciary breach under § 1104. 29 U.S.C. § 1132(a)(9).

126.    Plaintiffs allege that, even if any of the Lumen Defendants did not act as fiduciaries with respect to the selection of Athene, then in the alternative to Count I, such Defendants are liable under § 1132(a)(9) for their knowing participation in the breach of the fiduciaries who selected Athene. Each of these Defendants knew of the circumstances that rendered the responsible fiduciary's conduct a breach of fiduciary duties. These Defendants knew that the responsible fiduciary's investigation of available annuity providers was not objective or sufficiently thorough. These Defendants also knew that the Lumen Defendants' selection of State Street instead of a truly

independent fiduciary, or State Street's deficient selection/recommendation of Athene instead of a prudent alternative annuity provider, would generate a massive monetary benefit for the Lumen Defendants, and then knowingly accepted that benefit.

## COUNT III

**Prohibited Transaction against the Lumen Defendants for Hiring State Street**

127.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

128.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

129.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank*, 530 U.S. at 242, such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

130.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

131.    State Street was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). The Lumen Defendants knowingly caused the Plan to engage in a transaction resulting in a direct or indirect furnishing of services between the Plan and State Street. 29 U.S.C. § 1106(a)(1)(C).

132.    The Lumen Defendants entered into a prohibited transaction when they engaged State Street as the Plan's independent fiduciary, which facilitated the subsequent selection of Athene and harmed Plaintiffs and class members.

133.    The transaction at issue does not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

134.    By using pension trust assets to pay State Street – a party in interest that was not independent – the Lumen Defendants dealt with the assets of the Plan in their own interest or for their own account, and acted on behalf of a party whose interest in using a riskier, lower-cost annuity provider was averse to the interests of the Plan participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

135.    Each Lumen Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by virtue of engaging State Street instead of a truly independent fiduciary and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

136.    Each Lumen Defendant knowingly participated in the breach of the other Lumen Defendants, knowing that such acts were a breach, enabled the other Lumen Defendants to commit a breach by failing to lawfully discharge his, her, or its own fiduciary duties, knew of the breach by the other Lumen Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Lumen Defendant is liable for the losses caused by the breach of his, her, or its co-fiduciary under 29 U.S.C. § 1105(a).

137.    Even if the Lumen Defendants did not act as fiduciaries over the selection of State Street, each Lumen Defendant is still liable as a nonfiduciary party in interest who knowingly

participated in a prohibited transaction committed by another fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive knowledge of the circumstances that rendered the transaction unlawful. The Lumen Defendants had actual or constructive knowledge that engaging State Street – a party in interest – as an "independent" fiduciary was unlawful, and thus knew or should have known that the other fiduciary was engaged in an unlawful transaction by causing the Plan to transfer assets intended to fund the Plaintiffs' pension benefits to State Street, for State Street's immediate profit.

## COUNT IV

**Prohibited Transaction(s) against all Defendants for Engaging in Transaction(s) with Athene**

138.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

139.    Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plan to engage in the transaction(s) with Athene with actual or constructive knowledge that the transaction(s) constituted direct or indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

140.    The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

141.    Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by the Defendants by virtue of purchasing Athene annuities instead of the safest available annuity and by State Street by virtue of selecting or recommending Athene annuities instead of the provider with the highest claims-paying ability and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

142.    Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

## COUNT V

### Failure to Monitor Fiduciaries against the Lumen Defendants

143.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

144.    The Lumen Defendants had a fiduciary responsibility to oversee the Plan, including the monitoring of any other fiduciaries appointed or hired to manage the Plan on a day-to-day basis, and the day-to-day responsibility to select service providers, such as an annuity provider.

145.    A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards.

The Lumen Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9), and 29 C.F.R. § 2509.95-1.

146.    Had the Lumen Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or Defendants would have decided not to proceed with the transaction. As a result of these monitoring failures, Plaintiffs and class members suffered harm, including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

## JURY TRIAL DEMANDED

147.    Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

## PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transaction;

- Order Defendants to post adequate security to assure receipt by Plaintiffs and class members of all retirement benefits covered by Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and appoint Schlichter Bogard LLP as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA violations.

September 4, 2024                          Respectfully submitted,

                                           SCHLICHTER BOGARD LLP

                                           By: /s/ Kurt C. Struckhoff
                                           Kurt C. Struckhoff*
                                           Jerome J. Schlichter**
                                           Sean E. Soyars**
                                           Patrick R. Kutz**
                                           Terrence W. Scudieri, Jr.**
                                           100 South Fourth Street, Suite 1200
                                           St. Louis, Missouri 63102
                                           Telephone: +1 (314) 621-6115
                                           Facsimile: +1 (314) 621-5934
                                           kstruckhoff@uselaws.com
                                           jschlichter@uselaws.com
                                           ssoyars@uselaws.com
                                           pkutz@uselaws.com
                                           tscudieri@uselaws.com

                                           * Admitted to the District of Colorado
                                           **Applications for admission forthcoming

                                           *Counsel for Plaintiffs & the Proposed Class*