# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:24-cv-02434-PAB-TPO**

DOLLY DOW, and
VIRGINIA SAKAL, individually and as
representatives of a class of participants and
beneficiaries of the Lumen Combined Pension Plan
f/k/a CenturyLink Combined Pension Plan,

  Plaintiffs,

  v.

LUMEN TECHNOLOGIES, INC.,
LUMEN EMPLOYEE BENEFITS COMMITTEE,
CENTURYLINK INVESTMENT MANAGEMENT
COMPANY,
KATHLEEN M. LUTITO,
STATE STREET GLOBAL ADVISORS TRUST
CO., and
JOHN DOES 1–5,

  Defendants.

---

## AMENDED CLASS ACTION COMPLAINT

### JURY TRIAL DEMANDED

---

1.      Plaintiffs Dolly Dow and Virginia Sakal, individually and as representatives of a

class of similarly situated participants and beneficiaries whose benefit payments were transferred

unlawfully from the Lumen Combined Pension Plan (f/k/a CenturyLink Combined Pension Plan,

the "Plan") bring this action against Defendants Lumen Technologies, Inc. ("Lumen"), the Lumen

Employee Benefits Committee (the "Benefits Committee"), the CenturyLink Investment

Management Company (the "CIM"), and Kathleen M. Lutito (collectively the "Lumen

Defendants"), State Street Global Advisors Trust Company ("State Street"), and John Does 1–5 (together with the Lumen Defendants, "Defendants") for breaches of fiduciary duty and other violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), Pub. L. No. 93-406, 88 Stat. 829, as amended, 29 U.S.C. §§ 1001 *et seq.*

2.      Congress enacted ERISA and designed the statute to impose strict fiduciary duties and other conduct-regulating obligations upon plan sponsors, administrators, and others, such as to regulate their ability to transfer workers' benefits from the federally regulated pension system to private annuity providers. Plan fiduciaries must act "within the statutory parameters of prudence and loyalty," which "impose a fiduciary standard that is considered the 'highest known to the law.'" *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)), *cert. denied*, 140 S. Ct. 2565 (2020). The statute requires fiduciaries to act with both prudence and loyalty, and "solely in the interest of the" employees who participate in the plan. 29 U.S.C. § 1104(a)(1). That is, fiduciaries must make plan-related decisions with "an eye single to the interests of the participants and beneficiaries," instead of favoring their own interests. *Bierwirth*, 680 F.2d at 271 (citing RESTATEMENT (SECOND) OF TRUSTS § 170 (1959), Austin Wakeman Scott, *II Scott on Trusts* § 170, at 1297–99 (3d ed. 1967), George G. Bogert, *The Law of Trusts and Trustees* § 543 (2d ed. 1978)).

3.      On or about October 19, 2021, Lumen transferred over $1.4 billion of its pension obligations to either Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York (collectively, "Athene"), a highly risky private equity-controlled insurance company with a complex and opaque structure. Lumen's plan was assisted by State Street, the Plan's so-called "independent fiduciary." This transaction affected approximately 22,600 Lumen retirees and

their beneficiaries, including Plaintiffs, who depended on Lumen's promise to guarantee their pension benefits throughout retirement under an ERISA-governed plan. By offloading Lumen's pension obligations to Athene, Defendants caused Plaintiffs and similarly situated Lumen retirees and their beneficiaries to lose their status as "participants" in the Plan, and therefore, Plaintiffs are no longer entitled to ERISA's protections for employee retirement benefits.

4.      Although an employer's decision to transfer pension obligations to an insurance company is considered a business decision not subject to fiduciary standards, the choice of an insurer is a fiduciary decision subject to ERISA's strict standards of prudence and loyalty. To fulfill those standards, ERISA requires that a fiduciary satisfy exacting standards when selecting an annuity. *See* 29 U.S.C. § 1104 (mandating that fiduciaries act "solely in the interests of the participants and beneficiaries"); *see also* 29 C.F.R. § 2509.95-1 (fiduciary duty imposed by ERISA requires fiduciaries to select the "safest annuity available," and "purchasing an unsafe annuity" is "never justif[ied]"). In other words, the fiduciary must take steps to hire the provider that "best promotes the participants' and beneficiaries' interests in retirement security. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000). Hiring a materially riskier provider to save the employer money is an egregious violation of fiduciary standards. *Id*.

5.      Defendants did not select the safest possible annuity available to ensure the continued, long-term financial security of Lumen retirees and their beneficiaries. Instead, Defendants selected Athene, which is substantially riskier than numerous traditional annuity provider. Annuities issued by Athene are structured to generate potentially higher expected returns and profits for itself and its affiliates by investing in lower-quality, higher-risk assets rather than in quality assets that would better support its future benefit obligations. In transferring Plaintiffs'

3

pension benefits to Athene, Defendants put Lumen retirees' and their beneficiaries' future retirement benefits at substantial risk of default without appropriate compensation. Because the market devalues annuities when accounting for such risk, it is also likely that Lumen saved a substantial amount of money by selecting a group annuity contract (or group annuity contracts) ("GAC") from Athene instead of the actual safest annuity available.

6.      Lumen was not alone in placing its own interests over those of Plan participants and beneficiaries. As the Plan's independent fiduciary, State Street selected an annuity provider with whom it maintained a mutually beneficial relationship and profited handsomely. Putting a company's financial interest in saving money ahead of participants' interests in retirement security by selecting a riskier annuity provider is an egregious act of disloyalty.

7.      Retirees do not share in the potential upside of these high-risk strategies but bear the downside risk that losses will impair Athene's ability to pay their Lumen pensions. Thus, Athene's practices create substantial risk at a great cost to retirees. By transferring Plaintiffs' pension benefits to Athene, Defendants have deprived Plaintiffs of all the protections of federal law; substantially degraded the value of the pensions; and put the retirement benefits at substantial risk of default—a risk for which Lumen's retirees and beneficiaries were not compensated and devalued their pensions. Accordingly, in addition to other remedies, Plaintiffs seek to receive the monetary value of the additional risk of their annuity as demonstrated by the marketplace.

8.      To remedy these fiduciary breaches, Plaintiffs, individually and as representatives of a class of similarly situated participants and beneficiaries of the Plan, bring this action to obtain appropriate relief for Defendants' ERISA violations, including without limitation, disgorgement of the sums involved in the improper transaction and the posting of security to assure receipt by

Plaintiffs and class members of their full retirement benefits, and the monetary value of the reduced market value of Athene's annuities relative to the value of an ERISA-compliant annuity, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), (a)(3), (a)(9). The equitable relief that Plaintiffs seek is set forth herein, including in the Prayer for Relief.

## JURISDICTION AND VENUE

9.      **Subject-matter jurisdiction.** This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because it is an action brought under 29 U.S.C. § 1132(a)(2), (a)(3), and (a)(9).

10.      **Standing.** Plaintiffs have standing to bring this action. Plaintiffs have suffered at least five distinct injuries traceable to Defendants' conduct.

11.      *First*, the annuitization created a future risk that Plaintiffs will experience harm that satisfies Article III. As set forth below, Athene is substantially likely to fail in the near future. And the annuitization—which removed Plaintiffs from the Plan—substantially increased the risk that Plaintiffs will not receive the benefits that they earned and to which they are entitled. Based on the detailed factual allegations below, once Athene fails there is a substantial likelihood that Plaintiffs will not receive their benefits, including because the safeguards that Defendants say could protect Plaintiffs' benefits in the event of a failure are in fact highly correlated with Athene's financial condition (meaning that Athene's failure would almost certainly render those safeguards ineffective). For example, upon Athene's failure, it is highly unlikely that Athene could secure alternative funding to ensure that Plaintiffs receive their benefits in accordance with the schedules set forth in the group annuity contracts.

5

12.    *Second*, even ignoring the probability of Athene's complete inability to pay, the annuitization created a substantial likelihood that Plaintiffs will suffer Article III injury in the future. That is because even *before* it fails, Athene will likely be subject to regulatory actions that will require it to unwind its affiliated transactions and thereby necessarily *interrupt* Plaintiffs' benefits—a pocketbook injury that itself satisfies Article III. The likelihood that Athene will be required to unwind some of its affiliated, non-arms' length transactions and that Plaintiffs will thus suffer an interruption of their benefits is even greater than the likelihood that Athene will collapse altogether, as Athene may be forced into state-supervised rehabilitation or conservation, even if it does not recognize immediate, catastrophic losses. The risk that regulatory actions will lead to a moratorium on benefits payments to Plaintiffs is real and at least substantially likely.

13.    In fact, that is exactly what happened to a similar insurer, PHL Variable Insurance Company ("PHL Variable") discussed below, when regulators in Connecticut ordered a moratorium on certain annuitant payments in connection with rehabilitation proceedings that commenced in May 2024. As set forth in greater detail below, multiple insurers that share key characteristics with Athene (including PHL Variable) have been subject to similar regulatory action, including as recently as March 21, 2025. When an annuity provider is subject to such regulatory action and payments are delayed or reduced, massive costs are imposed on beneficiaries, including the lost time value of money during the interruption of benefits payments (which can extend for years and even decades) and the lack of access to annuity payments that are necessary for basic living expenses.

14.    *Third*, Plaintiffs have *already* been injured in having their accrued pension benefits and future retirement payments removed from an ERISA-governed pension plan backed by an

established, multi-billion-dollar corporation, and then placed in the hands of a private-equity controlled insurance company with a highly complex offshore structure and risky asset portfolio, and with the guarantees from the federal government completely stripped away. The annuitization quantifiably and substantially impaired the value of Plaintiffs' retirement benefits the moment it occurred. As a result of Defendants' misconduct in selecting Athene instead of the annuity that would best promote the transferees' interests, Plaintiffs lost the opportunity to obtain an annuity product of adequate quality and were forced to accept an inferior product.

15.     That the value of Plaintiffs' benefits has already been reduced by the annuitization is a fact demonstrable by actuarial science. Plaintiffs have demonstrated that this lost value has already accrued because: (i) a key factor in determining the value of an annuity replacing future pension benefits is the likelihood that the annuity provider can fulfill its obligations; (ii) it is well-settled and recognized by pension actuaries that the probability of non-fulfillment for a risky insurance company is far greater than for a PBGC-backed pension (the risk for the latter approximates 0%); and (iii) annuitization with a risky insurer thus erodes pensioners' net worth by the degree of the insurer's risk. Put simply, because the probability that Plaintiffs' PBGC-backed benefits from Lumen would fail was negligible, and the probability that Plaintiffs will not timely receive their benefits from Athene is substantial, the annuitization deprived Plaintiffs of significant value.

16.     An annuity from a risky insurer is not only worth measurably less than a PBGC-backed pension in this actuarial sense; actual decisions made by retirees confirm the reduction in the value to them. A body of independent research predicated on empirical data, as well as experimental findings, demonstrates that retirees overwhelmingly favor smaller annuity payments

with a safe insurer to larger payments from a risky insurer. When a retiree's PBGC- backed benefits are swapped for annuity payments of the same amount, the retiree has thus been deprived of the value of increased security that they had enjoyed from the pension. It follows that virtually all retirees would prefer to have their PBGC-backed pension rather than annuity payments from Athene, and a rational retiree properly informed about Athene's riskiness would, in nearly all cases, prefer a reduction in the amount of their pension payments to avoid Athene's assuming the responsibility to pay their benefits. Any rational investor would demand a greater reward for undertaking such a risk, a demand that Plaintiffs could not make.

17.    *Fourth*, Plaintiffs have suffered an independent Article III injury because Defendants' breaches of fiduciary duties caused Plaintiffs to suffer intangible, yet concrete injuries—namely, the invasion of legally protected interests—that were actionable at common law and thus satisfy Article III. Plaintiffs likewise have standing to seek disgorgement to remedy this breach of fiduciary duty.

18.    *Fifth*, Plaintiffs have suffered a separate and distinct Article III injury because the annuitization has deprived Plaintiffs of critical rights and benefits that they enjoyed under ERISA. Before the annuitization, the entity responsible for Plaintiffs' benefits (Lumen) was subject to ERISA's exacting fiduciary duties, which are among the highest known to law. After the annuitization, that is not true: the entity responsible for Plaintiffs' benefits (Athene) is not subject to ERISA's fiduciary standards (or any fiduciary standards). And, if Plaintiffs' benefits are unpaid by Athene or even interrupted, the annuitization will have stripped them of: (i) their right to a federal cause of action to sue the entity responsible for their benefits for breach of fiduciary duty; (ii) their right to ERISA's generous service of process, personal jurisdiction, fee- shifting, and

8

venue provisions; and (iii) their right to receive an effective remedy through the federal class action procedure.

19.    Plaintiffs' only recourse against Athene in the event of interruption or nonpayment of their benefits would be as third-party beneficiaries to a contract that Athene and Lumen drafted to benefit themselves without Plaintiffs' input. It is highly uncertain whether under those circumstances Plaintiffs would have: (i) access to a federal forum; (ii) any cause of action other than breach of contract; (iii) access to a forum that could exercise personal jurisdiction over the appropriate Athene entity; and (iv) the right to bring their claims collectively through an efficient class action, rather than through piecemeal actions in various state courts. The annuitization thus deprived Plaintiffs of a guaranteed effective remedy—which they enjoyed under ERISA—to sue the entity responsible for their benefits payments for any interruption or disruption of those payments, including because certain arms of Athene are based in and operate from Bermuda. Depriving a plaintiff of the effective remedy afforded to them by law alone establishes standing under Article III.

20.    *Sixth*, Plaintiffs have standing to compel Defendants to disgorge any assets derived from their illegal conduct.

21.    These injuries may be redressed by this Court. *See* 29 U.S.C. §§ 1109(a), 1132(a)(3), 1132(a)(9). Among other potential remedies, Section 1132(a)(9) explicitly authorizes a court to issue an affirmative injunction requiring "the posting of security" by the defendant to assure that affected individuals receive their benefits. Plaintiffs seek such injunctive relief here, among other remedies.

22.     **Venue.** This District is the proper venue for this action under 28 U.S.C. § 1391(b) and 29 U.S.C. § 1132(e)(2) because at least one of the alleged acts or omissions giving rise to liability occurred or failed to occur within this District, and at least one Defendant resides, may be found, or regularly transacts business in person in this District.

**THE PLAN**

I.     **The Lumen Combined Pension Plan (f/k/a CenturyLink Combined Pension Plan)**

23.     Prior to 1999, CenturyLink, Lumen's predecessor, had multiple pension plans for its legacy employees. One such plan was the Pacific Telecom Retirement Plan (the "PTI Plan"), maintained by CenturyLink for the benefit of Pacific Telecom, Inc.'s employees. On or about January 1, 1999, CenturyLink's employees became eligible to participate in the PTI Plan. Thereafter, the PTI Plan was renamed the CenturyTel Retirement Plan. The Lumen successor plans were renamed multiple times in subsequent years. During 2010, the CenturyTel Retirement Plan was renamed the CenturyLink Retirement Plan, and as a result of additional mergers, was renamed again to the CenturyLink Combined Pension Plan during 2014. Ultimately, on or about November 12, 2020, the CenturyLink Combined Pension Plan was renamed the Lumen Combined Pension Plan (the "Plan").

24.     The Plan is, and at all relevant times was, a defined benefit, employee benefit pension plan pursuant to 29 U.S.C. § 1002(2)(A), (35) covering certain eligible employees of Lumen and participating affiliated companies. The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102(a)(1).

25.     As of December 31, 2020, before the unlawful transaction at issue, the Plan covered 88,019 total participants and beneficiaries and held $10,584,462,672 in assets.

**PARTIES**

## II.    Plaintiffs

26.    Dolly Dow resides in Arvada, Colorado and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Dow began her employment with CenturyLink (n/k/a Lumen) in 1981. Over the next 35 years, Ms. Dow worked in CenturyLink's Consumer Department, retiring from her position as Senior Process Analyst in 2014. Ms. Dow began receiving pension payments from CenturyLink in 2014. Ms. Dow began receiving annuity payments from Athene in 2022.

27.    Virginia Sakal resides in Rio Rancho, New Mexico and was a participant in the Plan within the meaning of 29 U.S.C. § 1002(7). Ms. Sakal began her employment with Lumen in 1981. Over the next 36 years, Ms. Sakal worked at CenturyLink (n/k/a Lumen), spending her last ten years in the Wholesale Department. She retired from her position as Senior Operations Manager in 2015. Ms. Sakal began receiving third-party annuity payments from Athene in 2022.

## III.    Defendants

28.    Lumen Technologies, Inc., formerly known as CenturyLink, Inc. (NYSE: LUMN) ("Lumen"), is a publicly traded corporation headquartered in Monroe, Louisiana. Lumen is an American telecommunications company offering communications, network services, security, cloud solutions, voice, and managed services. As of December 31, 2022, Lumen employed approximately 29,000 employees and recorded $17.48 billion in annual net revenue. Lumen is the Plan sponsor under 29 U.S.C. § 1002(16)(B). Lumen entered into a commitment agreement with Athene under which the Lumen Defendants agreed to purchase a GAC (or GACs) that would transfer certain of Lumen's pension obligations to Athene. As alleged herein, Lumen exercised

discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

29.    The Lumen Employee Benefits Committee (the "Benefits Committee") is a Plan administrator under 29 U.S.C. § 1102(a). On information and belief, the Benefits Committee had the authority to manage and control the assets of the Plan. Accordingly, as alleged herein, the Benefits Committee exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

30.    The CenturyLink Investment Management Company ("CIM") is headquartered and incorporated in Denver, Colorado. CIM provides portfolio management, financial planning, and investment advisory services to Lumen's retirement plans. CIM was appointed by the Board of Directors of Lumen to serve as the Plan's the named investment fiduciary for all purposes related to the management and investment of Plan assets. CIM also is a Plan administrator under 29 U.S.C. § 1102(a) along with the Benefits Committee. Among other duties for the Plan, CIM had the authority to appoint and remove trustees, investment managers, and other investment-related service providers; enter into agreements; and determine general investment strategies for the Plan's assets. In connection with the annuity transaction at issue, CIM was one of the Lumen Defendants who caused the Plan to purchase the GAC from Athene, thereby transferring Plan participants'

retirement benefits to a risky annuity provider. As alleged herein, the CIM exercised discretionary authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

31.     Kathleen M. Lutito resides in Morrison, Colorado. Ms. Lutito was the President and Chief Investment Officer of CIM until May 2024. In her role, she oversaw all decisions and activities at CIM, including the investment strategy, design, and implementation of Lumen's pension plans, and the annuity transaction at issue. Ms. Lutito was a member of the CIM Board and the CIM Investment Committee, which is responsible for the investment strategies of the Plan. As alleged herein, Ms. Lutito exercised discretionary authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, was and is a fiduciary under 29 U.S.C. § 1002(21)(A)(i) and (iii).

32.     State Street Global Advisors Trust Co. ("State Street") is a trust company headquartered in Boston, Massachusetts. State Street is a wholly owned subsidiary of State Street Bank and Trust Company. As a wholly owned subsidiary, it was formed to facilitate State Street Bank and Trust Company's asset management business and State Street Global Advisors' U.S. institutional investment management business. In connection with the annuity transaction at issue, Lumen hired State Street to serve as an independent fiduciary to the Plan, which required, among other things, for State Street to select an annuity provider in compliance with 29 C.F.R. § 2509.95-1. State Street specifically admits that the selection of an insurance provider to annuitize pension plan benefit obligations is governed by that regulation promulgated by the Department of Labor.

13

On information and belief, Lumen and State Street entered into a commitment agreement with Athene under which the Lumen Defendants agreed to purchase a GAC (or GACs) that would transfer certain of Lumen's pension obligations to Athene. As alleged herein, State Street exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and was and is a fiduciary to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

33.    John Does 1–5 are unknown members of the Benefits Committee who exercised discretionary authority or discretionary control respecting management of the Plan, exercised authority or control respecting management or disposition of Plan assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan and, accordingly, were and are fiduciaries to the Plan under 29 U.S.C. § 1002(21)(A)(i) and (iii).

34.    Each Defendant is a fiduciary within the meaning of ERISA because selecting an annuity provider involves an act of discretionary authority over management of a plan or its assets. *See* 29 U.S.C. §§ 1002(21)(A), 1102(a).

**ERISA'S FIDUCIARY STANDARDS WHEN SELECTING ANNUITY PROVIDERS**

35.    ERISA's primary purpose, evidenced expressly by the plain meaning of its textual provisions, is to protect the retirement security of American workers and their beneficiaries, achieving its protective purposes by, among other things, imposing on plan fiduciaries strict standards of conduct derived from the common law of trusts, most notably, the fiduciary duties of loyalty and prudence. 29 U.S.C. § 1104(a)(1). The statute provides, in pertinent part and with emphases added, that:

14

[A] fiduciary shall discharge his duties with respect to a plan *solely* in the interest of the participants and beneficiaries and –

    (A) for the *exclusive* purpose of:

        (i) providing benefits to participants and their beneficiaries; and

        (ii) defraying reasonable expenses of administering the plan; [and]

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

36.    Because the selection of an annuity provider involves the exercise of discretion and implicates fiduciary duties, the Department of Labor has issued regulatory guidance, known as Interpretive Bulletin 95-1 ("IB 95-1"), setting forth its interpretation of the process a fiduciary is required to undertake in connection with transferring defined benefit pension plan obligations to an annuity provider pursuant to 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9). *See* 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available," among other requirements. *Id.* Fulfilling the duty of prudence requires an objective, thorough, and analytical search for an annuity provider. Precedential authority adopts a materially similar standard requiring a thorough investigation designed to obtain the annuity that "best promotes participants' and beneficiaries' interests" in retirement security, *Bussian*, 223 F.3d at 302, which in practice will invariably be the safest annuity.

37.    The general fiduciary duties imposed by 29 U.S.C. § 1104 are supplemented by a detailed list of transactions that are expressly prohibited by 29 U.S.C. § 1106 and are considered

*per se* violations because they entail a high potential for abuse, including self-dealing transactions and transactions with "parties in interest," defined to include "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries." *Harris Tr. & Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238, 242 (2000) (citing 29 U.S.C. §§ 1002(14)); *see also* 29 U.S.C. § 1106(a)–(b).

## FACTS APPLICABLE TO ALL COUNTS

### I.      Pension Risk Transfers ("PRT")

38.      "Defined contribution plans dominate the retirement plan scene today." *LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 255 (2008). Before defined contribution plans became the norm, defined benefit plans (or pension plans) dominated the retirement landscape. They were the nation's predominant retirement system when ERISA was enacted in 1974.

39.      Pension plans provide employees and retirees with a fixed, guaranteed lifetime benefit, typically in the form of a monthly income payment after retirement. Employers are generally responsible for funding the pension plan to pay their benefit obligations to retirees. A formula that accounts for salary and years of service, among other factors, determines the amount of retirement benefits provided to employees.

40.      A fundamental difference between traditional pension plans and defined contribution plans is which party bears the risk of underperformance. In a defined benefit pension plan, the plan sponsor (typically the employer) bears the risk. In a defined contribution plan, by contrast, the employee's benefit is limited to the value of an individual investment account, meaning the employee bears the risk of underperformance.

41.     A defined-benefit pension plan sponsor/employer agrees to pay monthly pension benefits to retirees as they come due for the rest of the participants' lives, and it funds those benefits through assets contributed both initially and over time by the employer that are invested and held in trust for plan participants. If, among other circumstances, investment returns fall short of expectations and are insufficient to satisfy obligations to plan participants, employers must make additional contributions to a defined benefit plan to comply with ERISA's funding requirements. Thus, the investment risk—the possibility that the plan's investments will generate insufficient returns to cover the plan's pension obligations and the expenses of operating the plan—is borne entirely by the plan sponsor. If the sponsor goes bankrupt or otherwise lacks the resources to continue to fund the Plan and pay required benefits, the PBGC steps in as a backstop to pay benefits due.

42.     These features of defined benefit plans make them both valuable and predictable for retirees. But because these plans are so valuable to employees, they are conversely expensive for employers. Consequently, in recent years, employers have increasingly sought to improve their bottom lines by shifting their liability for monthly pension payments to some of all of the plan participants to insurance companies through pension risk transfer ("PRT") transactions. In such a transaction, an employer offloads all or part of its pension benefit obligations by purchasing group annuity contracts with plan assets from an insurer, who then assumes the responsibility of future benefit payments to employees and retirees covered by the transaction.

43.     The upside of such transactions—enjoyed by plan sponsors—is increased profits; the downside—borne by plan participants—is the increased risk of losing promised retirement benefits, because the annuity provider is unable to perform and the benefits are no longer

17

guaranteed by their former employer and the PBGC. Although these transactions are now used by employers to dispense with defined benefit plans altogether, they are not new, as discussed below:

44.     A plan sponsor's process in selecting an annuity provider to which it transfers an employer's pension obligations is a critically important fiduciary function. This decision will have an irrevocable impact on retirees and their beneficiaries for the rest of their lives. As NISA Investment Advisors, LLC ("NISA") noted: it "is one of the most consequential decisions a fiduciary can make because it fundamentally changes the nature of the promised pension benefit."

45.     PRT transactions can take one of three forms: (1) total buyouts, "in which the plan sponsor terminates the plan and transfers all of the benefit obligations to an insurer through purchase of an annuity contract;" (2) partial buyouts, in which plan sponsors purchase an annuity from an insurance company to satisfy benefit payments to a select group of participants; or (3) buy-ins, in which the plan continues to issue payments to beneficiaries but from a monthly annuity amount paid to the Plan by an insurer. As discussed below, the Lumen PRT transaction at issue involved a partial buyout.

## II.     The risks associated with PRT transactions.

### A.     Lack of ERISA and PBGC Protections

46.     Participants lose protections under ERISA when their employer transfers its pension obligations to an annuity provider. With few exceptions, ERISA-governed defined benefit plans are covered by the Pension Benefit Guaranty Corporation ("PBGC"). When a PRT transaction occurs, affected pensioners lose both their ERISA and their PBGC protections, and are instead only protected by state guaranty associations ("SGAs").

18

47.     Plan sponsors of ERISA-governed defined benefit plans are required to pay PBGC premiums, on which the PBGC relies if a plan sponsor becomes insolvent. These monthly limits for normal retirees currently range from over $7,000 per month for a single life annuity for a 65-year-old to well over $17,000 per month for a 75-year-old. Because PRT transactions remove PBGC protections, they also remove PBGC premium obligations. Thus, removing participants from a plan through a PRT leaves pensioners unprotected by the PBGC while saving the employers money in premium payments that will never need to be made. Not only does this leave affected pensioners without PBGC protections, but it poses a funding risk to the PBGC, therefore threatening the level of protection offered to those participants by the PBGC.

48.     Additionally, although the PBGC is not explicitly backed by the full faith and credit of the federal government, it is commonly agreed that, as a practical matter, the PBGC is backed by the full faith and credit of the federal government because, in the event of the PBGC's financial insolvency, Congress would face overwhelming pressure to bail out the PBGC to protect against massive losses by pension beneficiaries of their accrued benefits.

49.     SGAs are neither pre-funded like the PBGC nor effectively backed by the federal government; thus, they offer substantially less protection compared to the PBGC.

50.     SGAs are funded by assessments of member insurers, but only in the case of another insurer's declaring insolvency. This means that it is very unlikely for an SGA to afford retirees protection until after they have not timely received their benefits payment.

51.     And SGAs only provide coverage up to state law limits rather than one standard limit as defined by the PBGC. In most states, this limit is set to $250,000 "in present value of annuity benefits," which a pensioner could exhaust in mere years if their annuity provider becomes

insolvent. For some annuitants, the situation is even worse. In certain states (including California), such an annuitant automatically loses 20%, as some SGAs guarantee a maximum of 80% of the present value of the annuity, up to $250,000. California Insurance Code § 1067-1067.18.

52.     Further, SGAs often take the position that guaranty association coverage is only "triggered" by a final Order of Liquidation. This means that in the case of an insurance company "rehabilitation" (a different process than liquidation), guaranty association coverage is not triggered at all. This risk is not hypothetical. In the case of insurer PHL Variable, as described in more detail below, the Connecticut Superior Court entered a Moratorium Order in May 2024 that immediately and significantly reduced policy benefits, withdrawals and death benefit payouts tied to SGA limits. However, SGAs have contributed nothing to PHL's rehabilitation and in at least one case the California Guaranty Association declined to cover a benefit over the court-ordered cap because "the California Life and Health Insurance Guarantee Association (CLHIGA) lacks the statutory authority to take any action with regard to PHL Variable Life Insurance prior to a court order of liquidation.

**B.     Risk of Insolvency and Executive Life**

53.     The risk of insurance company failure is not merely hypothetical. The 1991 collapse of Executive Life Insurance Company ("Executive Life") provides a stark look into the potentially catastrophic consequences of high-risk insurance practices. Like the alleged conduct involving Athene, Executive Life was able to secure billions of dollars in assets and hundreds of thousands of policyholders by seizing on a competitive advantage: declaring interest rates on single-premium, deferred annuities that far exceeded industry averages.

54.    In 1991, over 300,000 policyholders relied on Executive Life, which at the time held an A+ credit rating for financial soundness, for regular payments. But, in 1990, Executive Life's bond portfolio "cratered amid a bond market meltdown" before its 1991 seizure by the California Insurance Commissioner. Following the seizure, the California Insurance Commissioner sold Executive Life's portfolio to Leon Black, co-founder of Apollo Global Management ("Apollo"), for approximately half its value. Apollo is the parent company of Athene. Losses to policyholders as a direct result of the Executive Life takeover were extreme, with policyholder damages estimated at $3.9 billion in 1991 (equivalent to approximately $9.1 billion in 2024).

55.    Leon Black was the co-head of brokerage firm Drexel Burnham Lambert ("Drexel"). First Executive Corporation (the parent company of Executive Life of California and Executive Life of New York) was Drexel's largest buyer of junk bonds. Unlike most insurance companies that invested in safer assets such as high-grade bonds, mortgage securities, and government obligations, Executive Life invested in risky junk bonds with high interest rates. Executive Life's portfolio consisted of 60% junk bonds in comparison to the industry-standard 24% at the time of its collapse. First Executive Corp., the parent company of Executive Life of California and Executive Life of New York, was one of Drexel's largest buyers of junk bonds. This risky behavior allowed Executive Life to make higher payouts to policyholders in the short-term, but its capacity was short-lived.

56.    The failure of Drexel led to Executive Life defaulting on its annuity contracts, thereby failing to make good on its obligations to tens of thousands of pension annuitants. By 1990, many of the Executive Life assets used to fulfill annuity payment obligations were in distress

and trading for significantly less than their purchase price. However, on December 27, 1990, the National Association of Insurance Commissioners ("NAIC") published its findings that Executive Life's California and New York insurers were not in imminent financial danger, and therefore it was unnecessary for state insurance regulators to take over the insurers. When questioned about the risky makeup of its bond portfolio, Executive Life often pointed to its "impeccable" ratings from major ratings agencies, touting an A+ rating from AM Best and an AAA rating from Standard & Poor's.

57.    Executive Life was often selected by employers because its risky investment strategy allowed for it to offer the lowest bid on GACs. Rather than choose a safer, more expensive annuity, employers placed their own financial interests over plan participants' needs.

58.    On April 11, 1991, despite the NAIC's recommendation, California Insurance Commissioner John Garamendi seized Executive Life of California because its financial condition posed a threat to its policyholders. Up until a week before the seizure, Executive Life maintained a "contingent B-plus" rating from AM Best, meaning that it was still considered "very good" despite a decline in position pending review. Contrary to ratings agencies' pronouncements, as well as Executive Life's statements that its investments were safe, less than a week later, on April 17, 1991, the New York insurance regulator seized Executive Life of New York. From there, it took only weeks for parent company First Executive to file for bankruptcy protection. With the help of ratings agencies, Executive Life obscured the true riskiness of its bond portfolio, and hundreds of thousands of pensioners lost the vested financial security in retirement that their former employers had promised them in exchange for years of dedicated service.

59.     Executive Life was ultimately declared insolvent in 2012. In August 2013, the Guaranty Association of Benefits Company ("GABC") was created to liquidate Executive Life. GABC continues to make payments to annuitants. However, a large number of annuitants lost 50% or more of their annuity payments. The Executive Life Restructuring Agreement provides that GABC is expected to make reduced annuity payments to Executive Life annuitants for another 50 years.[1]

60.     Two other large insurance companies, First Capital and Fidelity Bankers, also failed near the time of the failures of Executive Life and Executive Life of New York. A study as to the causes of these failures by the United States General Accounting Office ("GAO"), found a common thread: reckless practices of poorly controlled growth and investment in high-risk assets. The assets of the failed insurers grew at a rate six to ten times faster than the life insurance industry's overall asset growth rate, in part due to sales of high-risk investment products. Losses of only 8.3% to 11.7% in these insurers' high-risk investments would be enough to eliminate their surplus and reserves. The insurers artificially inflated their surplus through a heavy reliance on reinsurance transactions. The Executive Life entities could have been declared insolvent as early as 1983—eight years earlier—if they had not masked their true financial condition through the excessive use of reinsurance and borrowed surplus. In short, poorly controlled growth, high-risk holdings coupled with thin surplus, and excessive reinsurance were driving factors in the failures of the Executive Life entities, First Capital, and Fidelity Bankers. Athene engages in the same

---

[1] *See* Agreement of Restructuring in Connection with the Liquidation of Executive Life Insurance Company of New York (Apr. 23, 2023), and Schedule 1.15 (List of Contracts).

high-risk practices which the government found were responsible for the collapse of these four insurers. *See infra*, Section III.

**C.      Response to Executive Life and Interpretive Bulletin 95-1**

61.      Members of Congress were outraged by Executive Life's collapse and its impact on hundreds of thousands of American retirees, and in order to prevent similar crises in the future, Congress passed the Pension Annuitants Protection Act of 1994, Pub. L. No. 103-401, 108 Stat. 4172 (Oct. 22, 1994) ("PAPA") (codified as amended 29 U.S.C. §§ 1132(a)(7), 1132(a)(8), 1132(a)(9), 1132(*l*)(3)(B)), as an amendment to ERISA creating a right of action to obtain appropriate relief for ERISA violations involving the "purchase of an insurance contract or insurance annuity," including, but not limited to, "the posting of security" as needed to ensure that participants receive their full benefits, plus prejudgment interest. 29 U.S.C. § 1132(a)(9).

62.      On March 6, 1995, the Department of Labor promulgated IB 95-1, which—like PAPA—aimed to prevent the irresponsible transfer of pension liabilities to insurance companies insufficiently secure to guarantee retirement benefits—a principal animating force behind the enactment of PAPA and indeed ERISA itself. IB 95-1 has since been updated consistent with that purpose.

63.      IB 95-1 is an application and summary of the fiduciary duty set forth in ERISA as that duty pertains to a defined benefit plan's selection of an annuity provider for an annuitization. *See* IB 95-1(a)-(c). IB 95-1 thus provides courts, regulated entities, and the public with the Department of Labor's expert guidance on the content of that fiduciary duty in the particular circumstance at issue in this action. It explains that selecting an annuity provider is a fiduciary decision under ERISA, 29 U.S.C. § 1104(a), and that employers therefore must act solely in the

interest of the plan's participants and beneficiaries in accordance with ERISA's strict prudence standard when selecting an annuity provider. IB 95-1(b) (citing 29 U.S.C. § 1104(a)).

64.     The Department of Labor instructed fiduciaries that they "must take steps calculated to obtain the safest annuity available, unless under the circumstances it would be in the interests of participants and beneficiaries to do otherwise." Fiduciaries must also, at a minimum, "conduct an objective, thorough and analytical search for the purpose of identifying and selecting providers from which to purchase annuities." IB 95-1(c).

65.     To determine the safest available annuity, IB 95-1 requires plan fiduciaries to evaluate the insurer's "claims paying ability and creditworthiness" by considering six factors: (1) the annuity provider's investment portfolio quality and diversification; (2) "[t]he size of the insurer relative to the proposed contract;" (3) "[t]he level of the insurer's capital and surplus;" (4) the insurer's exposure to liability; (5) the structure of the annuity contract and the guarantees supporting them; and (6) the availability of additional protection through SGAs. The fiduciaries must "obtain the advice of a qualified, independent expert" if they do not possess the necessary expertise to evaluate these factors properly.

### D.     Private Equity Firms

66.     Since Executive Life's collapse, the PRT market has been dominated by traditional annuity providers, including New York Life Insurance Company ("New York Life"). But more recently, a new class of annuity providers, backed by private equity firms, entered the market.

67.     The mission of private equity does not align with the interests of annuitants. While private equity firms began by purchasing insurance companies to finance operations, today they have moved beyond this business into the lines of private credit and insurance. Not only are private

equity firms able to invest cash from premiums into their other affiliated businesses, they can also generate enormous investment management fees for themselves. They focus on maximizing their immediate financial returns instead of ensuring receipt of the guaranteed pension benefits due to their annuity beneficiaries.

68.     The United States Department of the Treasury expressed concerns of the potential misalignment between "the shorter-term objectives/strategy of the alternative asset manager investment model and the long-term commitment necessary for fulfilling annuity/life insurance policyholder interests." The Department of Labor also conducted a review of IB 95-1 through consultation with the Advisory Council on Employee Welfare and Pension Benefit Plans. During a meeting of the Council, several concerns were raised surrounding private equity's increasing role in the insurance and annuity industry, including high investment management fees, conflicts of interest, and the introduction of new risk.

69.     As of 2023, private equity firms had spent almost $40 billion on insurance company purchases and controlled over 7% of the industry's assets, double those that they controlled in 2015. Lawmakers and industry experts are also concerned by this trend. U.S. Senator Sherrod Brown of Ohio sent a letter dated March 16, 2022, to the Federal Insurance Office ("FIO") and the NAIC expressing concerns that the "insurance investment products workers depend on for their retirement are being transferred to these risky companies that have a track record of undermining pension and retirement programs."

70.     These private equity owned insurers are considerably more likely than traditional annuity providers to become insolvent now and in the future because (i) they have not been tested through a full economic cycle and have never weathered a recession; (ii) re-insurance annuities

with offshore insurance companies are not required to set aside as much capital as the traditional U.S.-based insurance companies; and/or (iii) invest in assets that are riskier, less liquid and more opaque than those invested in traditional providers, such as collateralized loan obligations ("CLOs"), asset-backed securities, private fixed-income placements, subordinated debt, and even the stock of affiliated companies.

71.     Independent industry experts, scholars, and journalists have begun to sound the alarm that these private equity-backed insurers are unstable and even threaten the wider financial system. For example, a paper authored by two economists, Natasha Sarin, of Yale Law School, and Divya Kirti, of the International Monetary Fund, found that "PE [private equity]-backed insurance firms take on greater risk [than non-private equity-backed firms] by moving out of highly rated corporate bonds and into poorly rated private-label asset backed securities, increasing their holdings of private-label asset-backed securities by two-thirds of the industry average." This risk-taking is nearly instantaneous: according to Professor Sarin, "[w]ithin days of a P.E. acquisition of an insurance company, they tilt their bond portfolios to riskier assets."

72.     In the wake of the recent surge in life insurer liabilities and annuity sales spurred on by PRT transactions, many life insurers "report razor-thin surpluses relative to the size and risk profile of their balance sheets," backed by private equity have reported extremely small surpluses relative to the risk profile of the assets held in their portfolios. The increased use of complex investment strategies has led to the greater prominence of illiquid and volatile assets in the insurers' portfolios, which is in stark contrast to the safe, high-quality corporate bonds that back traditional life insurance policies. These high-risk, high-yield investment strategies allow private equity-

27

owned life insurers to boast higher returns than traditional life insurers, making their bids in PRT transactions seem attractive.

73.     Three economists at the Board of Governors of the Federal Reserve System have also recounted how such insurers have, since 2009, developed "a new shadow banking business model that resembles investment banking in the run up to the 2007–09 financial crisis. These life insurers profit by lending to highly-leveraged firms. In particular, they originate risky loans, hold them, and securitize them in [collateralized loan obligations]." By extending credit to "risky projects," these insurers "earn a sizeable spread over the cost of their fixed-annuity liabilities." The paper "show[s] that these life insurance companies hold some of the riskiest portions of the CLOs issued by their own affiliate asset managers against virtually no capital." It also shows that "[t]he shadow banking business of life insurers exponentially increases the industry's vulnerability to aggregate corporate-sector shocks." In short, certain insurers have, since the 2008 financial crisis, "filled a void left by banks in risky corporate loan markets." In doing so, they have "create[d] and become vulnerable to run risk," the likelihood that such insurers could see their assets shrink quickly and irreversibly when markets turn down. The paper identifies Athene as an example of one insurer that has a shadow banking business.

### III.     Athene and its financial risks.

74.     Athene Annuity and Life Company is a subsidiary of Athene Holding, Ltd. and was founded in 2009 by Apollo executives as an insurance affiliate. Athene Annuity & Life Assurance Company of New York is a wholly owned subsidiary of Athene Annuity and Life Company that conducts insurance business in New York. As noted, unless otherwise indicated, Athene Annuity

28

and Life Company and Athene Annuity & Life Assurance Company of New York are collectively referred to as "Athene."

75.     On March 8, 2021, Apollo announced its merger with Athene, which was completed in 2022. Apollo was founded by Drexel alumni Leon Black, Josh Harris, and Marc Rowan in 1990, the year Drexel collapsed and entered into bankruptcy (causing the collapse of Executive Life). Leon Black was not only the co-head of Drexel during Executive Life's junk bond binge, but also the financier who purchased Executive Life's discounted assets after its implosion. Apollo found a way to make money off the retirement savings of millions of everyday Americans by buying out corporate retirement obligations cheaply, and then backing up their resulting annuity obligations through collateralized loans and other risky assets. The purchase of these distressed assets ultimately led to Apollo forming Athene and guiding its investment process, though not initially owning Athene. The very formation of Athene was based on the use of high-risk distressed insurance assets as the foundation for annuities held by individuals.

76.     At the time of the merger, Athene accounted for roughly 40% of Apollo's assets under management and generated 30% of its fee revenue. Following the merger, Athene became a subsidiary of Apollo. Today, approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its PRT liabilities are reinsured through Bermuda-based affiliates owned by Athene's parent, Apollo.

77.     Athene and Apollo's interdependence is a cause for serious concern and poses substantial risk to retirees who are dependent on Athene's ability to pay, not only at the present time, but for decades in the future. This interdependence has become much more alarming as a result of a recent financial analysis of Apollo's portfolio companies. Moody's, a top ratings agency,

29

recently reported that *nearly 25%* of Apollo-owned companies have defaulted since 2022. This is largely because private equity firms, such as Apollo, rely on the use of large amounts of debt to finance purchases of companies for their portfolios, producing heavily indebted companies. In times of ultra-low interest rates, as was the case for many years until recently, this heavy debt load could be managed by the companies. However, the recent dramatic rise in interest rates has made repayment of debt a staggering problem for many of these companies, leading to defaults.[2]

78.    Because of that high debt load, private equity-owned companies, including those owned by Apollo, are now defaulting at alarming rates. The failures of these companies were exacerbated by an increase in interest rates. Private equity-owned companies, such as those owned by Apollo, carry increased debt and have lower credit ratings than non-private equity-owned companies, causing them to default at a higher rate. Between January 2022 and August 2024, private equity owned companies defaulted at a rate of 17% according to Moody's. This is double the default rate of non-private equity-owned companies. Apollo's portfolio companies' default rate is much higher. Apollo's default rate since 2022 is three times the rate of companies not owned by private equity firms. And since the end of 2020, two-thirds of all corporate defaults came from private equity-backed firms.

79.    The importance this extraordinary rate of Apollo portfolio companies to Athene annuity holders can be seen from Athene's 2024 publicly available statutory filings. Those filings

---

[2] *See, e.g.*, Matt Wirz and Miriam Gottfried, *Private Equity World Engulfed by Perfect Storm*, WALL ST. J., Apr. 17, 2025, *available at* https://www.wsj.com/finance/investing/private-equity-world-engulfed-by-perfect-storm-2a2da2ad; Jason Zweig, *Don't Buy Into This Easy Fix for Stock-Market Craziness*, WALL ST. J., Apr. 18, 2025, *available at* https://www.wsj.com/finance/investing/stock-market-craziness-alternative-funds-7df17b9c.

show that almost 50% of Athene's second quarter 2024 investments had some affiliation with Apollo. Thus, Apollo companies' recent ominous default rates directly affect Athene's risk of default.

80.    Additionally, in the second quarter of 2024, over 75% of Athene's investments were of volatile illiquid assets. This means that if there is a severe correction in the financial marketplace, the market value of these illiquid assets will greatly decline in value. These illiquid, volatile assets will suffer more than traditional insurance companies' conservative, fixed-income investments, which have a definitive market value. Thus, Apollo's troubled assets, so heavily owned by Athene, rather than being a source of strength, are in fact a serious impending risk for Athene's insolvency. Because Athene and Apollo's assets are so highly interconnected, Athene will continue to suffer from Apollo's defaulting companies and be financially exposed.

81.    Risky investments are a defining characteristic of private equity owned insurers like Athene, who move investments from conservative "plain vanilla" fixed income investments such as U.S. Treasuries into high risk and illiquid assets immediately upon the acquisition of an insurance company.[3] In its 2024 Annual Report, the Financial Stability Oversight Council noted that, of all industries, the life insurance sector has experienced the most structural change, including "the adoption of alternative investment strategies, shifts in the composition of liabilities, growth in the use of offshore reinsurers, and an influx of private equity firms… into the sector."[4] A 2021 AM Best study found that private equity-owned insurers redeployed assets "from

---

[3] *Risky Business: Private Equity's Life Insurance Gambit*, AMERICANS FOR FIN. REFORM EDUC. FUND, at 10, Dec. 2023, *available at* https://ourfinancialsecurity.org/wp-content/uploads/2023/12/Private-Equitys-Life-Insurance-Gambit-02.pdf.

[4] *2024 Annual Report*, FIN. STABILITY OVERSIGHT COUNCIL, Dec. 2024, *available at* https://home.treasury.gov/system/files/261/FSOC2024AnnualReport.pdf.

traditional, safe insurance investments to higher-risk investments that increased the overall portfolio risks and raised the risk-based capital profile risks by 57 percent."[5]

82.    Additionally, the risks of these non-traditional investments grow over time, "especially in the higher interest rate environment that makes repaying leveraged loans more expensive and makes these loans more prone to default."[6] Turning to Athene to illustrate this risk, the authors observe that in 2022, when Apollo took over Athene, it "redeployed its assets from a 'squeaky clean' portfolio of government bonds and highly rated financial instruments to far riskier investments in subprime mortgages, payments from vacation timeshares, and even a railroad in Kazakhstan."[7]

83.    Approximately 20% of Athene's portfolio is invested in risky asset-backed securities and leveraged loans, and approximately 80% of its pension risk transfer liabilities are reinsured through Bermuda-based affiliates, not through third party reinsurers. This is in contrast with traditional life insurance companies, which ordinarily purchase re-insurance from third- party traditional reinsurance companies, thereby diversifying risk. By forming an in-house reinsurer and then basing it in Bermuda, Athene is not diversifying risk at all.

A.    **Athene's complex and risky offshore practices threaten pensioners.**

84.    Athene and Apollo pioneered much of the risky conduct characteristic of private equity-backed insurers. Athene is today a prime example of an insurer that has grown its shadow

---

[5] *Risky Business: Private Equity's Life Insurance Gambit*, AMERICANS FOR FIN. REFORM EDUC. FUND, at 10, Dec. 2023, *available at* https://ourfinancialsecurity.org/wp-content/uploads/2023/12/Private-Equitys-Life-Insurance-Gambit-02.pdf.
[6] *Id.* at 10–12.
[7] *Id.* at 12.

banking business by assuming an organizational structure that allows it to engage in risky conduct with former pension plan assets.

85.    Athene's use of complex investment structures subject to lax regulatory standards has contributed to its high level of risk as an annuity provider. As with other insurers engaging in shadow banking, a central feature of Athene's organizational structure is the location of its captive reinsurance subsidiaries, Athene Life Re Ltd. and Athene Annuity Re Ltd., both of which are headquartered in Hamilton, Bermuda. Reinsurance is the back-up or guaranty standing behind the insurer's primary obligation. It is thus a key element in the safety of that obligation. From 2018 to the present, these captive reinsurers have allowed Athene to capture market share using the tax-free status of their reinsurers to leverage lower pricing compared to traditional annuity providers. In Bermuda, capital requirements are lower, investment limitations are virtually non-existent, and transparency is minimal to zero.

86.    The reinsurance of PRT liabilities in Bermuda also poses unique risks to pensioners. For example, the Bermuda Solvency Capital Requirements ("BSCR") require insurers to hold similar levels of capital against both corporate bonds and CLOs, even though some CLO tranches have greater downside risk than bonds with the same credit rating. According to Federal Reserve Board economists, insurance companies like Athene hold some of the riskiest portions of the CLOs issued by their own affiliated asset managers. Athene has a higher-than-average investment in CLOs, and as of September 30, 2023, approximately 35% of its $20.6 billion of CLOs was in one prominent market reporter's unfavorable BBB category, a higher concentration than that of most other U.S. life insurers.

87.     Annuity and life insurance companies maintain surpluses to ensure long-term solvency. An insurer's surplus, or the difference between its assets and liabilities, acts as the only barrier between solvency and insolvency. To ascertain whether an insurer is able to pay out policyholder claims, the industry looks to the insurer's "surplus-to-liability ratio," calculated by dividing an insurer's surplus by its liabilities. In the wake of the recent surge in life insurer liabilities and annuity sales spurred by PRT transactions, some life insurers backed by private equity report extremely small surpluses relative to the risk profile of their assets in their portfolios.

88.     Industry professionals recognize that there are four prevalent factors that must be assessed to evaluate the risk profile of an annuity provider: (1) adequate surplus relative to the carrier's size and risk profile; (2) the magnitude of the carrier's use of affiliated reinsurance relative to the surplus maintained by the carrier; (3) excessive growth rates of liabilities relative to surplus; and (4) the magnitude of higher-risk, less-liquid investments held in the portfolio relative to the surplus maintained by the carrier. The first two factors are recognized as driving factors leading to an insurer's insolvency.

89.     As of year-end 2023, Athene's surplus stood at only 1.44%. In contrast, a traditional insurer, New York Life, maintained a surplus-to-liability ratio of 12.24%, and the national average is over 7%. New York Life, in particular, is a relevant comparison because it has approximately the same amount of total liabilities as Athene. As of December 31, 2023, Athene had $199.1 billion in total liabilities, and New York Life had $206.6 billion. Athene's surplus-to-liabilities ratio is also staggeringly low when compared to that of other peer insurers: Teachers Insurance & Annuity Association ("TIAA") (13.83% with approximately $304 billion in total liabilities during that

34

time), Nationwide Life Insurance Company ("Nationwide Life") (6.77%), and Pacific Life Insurance Company ("Pacific Life") (6.50%).

90. The actual dollar amounts of surplus tell a similar story. When considering the universe of insurance carriers as of December 31, 2023, Athene carries almost the thinnest surplus. More than 99% of insurance carriers have a higher ratio of surplus-to-liabilities than Athene. Of the 695 active insurance carriers (*i.e.*, those active carriers reporting liabilities), Athene's surplus-to-liabilities ratio ranked 689th (or in the 99th percentile). Just five carriers had a lower (or worse) ratio than Athene. When focusing on the largest insurance carriers with $100 billion in liabilities, Athene ranked 21 of 22 (or in the 95th percentile). Again, just one carrier had a lower ratio than Athene.

91. As such, annuitants whose pensions have been transferred to Athene are at a significantly heightened level of risk compared to the level of risk that they would have assumed had their pensions been transferred to a safer insurer.

92. Athene touts an ample surplus, but this is misleading. When Athene discusses its surplus, it refers only to that of Athene Holding Ltd., the parent holding company. An examination of Athene's stand-alone annual statement reveals its actual surplus-to-liabilities ratio, which as discussed *supra*, is among the thinnest in the country. Athene's total liabilities also increased by more than 250% from 2018 to 2022, as shown in the chart below. In contrast, a traditional insurer, New York Life, increased its liabilities as a percentage of assets by 25%. Athene's dramatic increase in its liabilities further adds to the risk and volatility assumed by Plaintiffs and similarly situated retirees. A diligent and thorough investigation into Athene's surplus would have disqualified Athene from being selected as the "safest available" annuity provider.



93.    A rapid growth in liabilities is a red flag for any life and annuity carrier because front-end expenses such as annuity commissions and underwriting expenses eat into profitability and it takes years for any new business to become profitable. 250% growth over a five-year period is an outlier and should have served as a red flag pointing to Athene's disqualification as a safe and secure steward for Lumen pensioners.

94.    In addition to the rapid growth in liabilities, Athene also reported an even more rapid growth in its reliance upon assets originated by its parent company, Apollo. As set forth in the chart below, Athene's "affiliated assets" surged by 639.21% from 2018 until 2022 as reported in Athene's 2022 annual statement, whereas other PRT providers reported measured and incremental growth in exposure to affiliated assets over the same five-year period. Affiliated assets are much riskier and less liquid than traditional marketable securities (such as an IBM corporate debentures) because they are tied to the insurer's (or its parent's and subsidiaries') underlying financial health and do not diversify risk.



95.    This commingling of Apollo's assets with Athene's is a separate and alarming risk of selecting Athene. According to a study by the rating agency Moody's, "Private equity groups including Platinum Equity, Clearlake Capital and Apollo Global are struggling with the hefty debt loads of their holdings. Nearly a quarter of the Apollo-owned companies that Moody's rates have defaulted since 2002," the agency said.

96.    Not surprisingly, Athene has more affiliated assets relative to its surplus than any other life and annuity company in the United States, ranking number 703 out of 703 companies.

97.    Athene also has a high concentration of risky assets relative to its surplus. As reported at year-end 2022 in its statutory filing, Athene had significant exposure to high-risk assets, including commercial mortgages, mezzanine loans, real estate held for income, real estate held for

sale, derivatives, other invested assets, other write-in assets, and high-risk bonds including RMBS, CMBS, and other loan-backed and structured and private credit notes.

98.     As set forth in the chart below, Athene's surplus as a percentage of these higher risk asset categories is not even 4%. This means that only 4% of Athene's high-risk assets would have to default for Athene's surplus to be wiped out.



99.     As shown above, Athene has dramatically more exposure to high-risk assets than other PRT providers, and the buffer protecting Athene's policyholders is razor thin.

100.    Athene also held $18 billion in "Deposit type contracts" for 2022 compared to $2 billion in surplus. These contracts are effectively funding agreement-backed notes and are not reported as debt. Because they are callable by institutional investors, Athene may experience a liquidity crisis, like that which existed during the March 2023 collapse of Silicon Valley Bank or during the 2008 financial crisis, during which it is certain that sophisticated investors in these funding agreement-backed notes would request their money back before "de-risked" pensioners

would even suspect that a liquidity crisis was looming. Funding agreement-backed notes are not reported as debt as they are considered an insurance product. During the first six months of 2024, Athene increased its level of funding agreement-backed notes to 38%, up from 11% in 2023. Accordingly, Athene has overstated its actual liquidity, further contributing to the substantial risk of Lumen retirees not receiving their pensions.

101.    These concerns are not hypothetical. Although their timing is difficult to predict, market downturns—including sharp ones—are inevitable during the 30-year-plus life of the annuities at issue here.

102.    The Financial Times also reports that "Apollo credits its executive Jim Belardi with inventing FABN-like products" – the same products that led to the near-collapse of AIG during the 2008 financial crisis.

103.    And today Athene's affiliated transactions are, on information and belief, also dramatically understated. It is publicly known that Apollo has had a long-term practice of bundling asset-backed notes and selling those notes to Athene in exchange for upfront cash and future management fees.

104.    The International Monetary Fund issued a Global Financial Stability note in December 2023, warning of portfolio liquidation challenges due to the increased use of structured investments. "Greater investment in structured and private credit worsens the liquidity mismatches between assets and liabilities, which could make liquidating portfolios more challenging if facing margin calls on derivatives or repurchase agreement contracts or policy surrenders should interest rates continue to rise rapidly."

105.    Athene's investment in affiliated assets also illustrates its higher risk because when an annuity provider is hit by a regulatory event such as "rehabilitation" or "conservation," its affiliated investments suffer a more significant and rapid asset value write-down compared to unaffiliated investments. These affiliated investments are highly dependent on affiliated carriers (Athene Annuity Re Ltd.) for operating cash flow. The carriers are not independent of Athene and therefore are correlated with Athene's overall health. And these affiliated investments of Athene are exploding.

106.    From 2019 through 2023, Athene went from $4 billion to $19 billion in affiliated investments, while New York Life's affiliated investments increased from $17 billion to $23 billion. The percentage increase among these carriers illustrates the dramatic increase in affiliated assets of Athene relative to New York Life. Over the five-year period, Athene's growth in affiliated assets was 368%, whereas New York Life's growth rate was 33%. Athene's growth rate in affiliated assets was therefore 1100% of New York Life's. And in 2024, Athene's use of affiliated investments soared to an alarming $40.5 billion, representing an over 100% increase in affiliated investments in just one year. In stark contrast, New York Life's use of affiliated investments decreased by approximately 1% in 2024 when compared to 2023.

107.    In 2024, Athene also increased its level of funding agreement-backed notes ("FABNs") to nearly $40 billion, a nearly 100% increase in a single year compared to 2023, when Athene had approximately $21.7 billion in FABNs. These FABNs are issued by SPVs owned by Athene, to institutional investors. They are simply promissory notes: promises to make payments in in the future in specified amounts, but without any segregated collateral whatsoever. These notes issued by Athene-owned SPVs are then sold to institutional investors for shorter durations than the

funding agreements themselves. This creates the same type of duration mismatch that led to the financial crisis in 2008: long duration liabilities (annuities) funded with short duration notes (Deposit Type Contracts). The underlying credit in FABNs is doubtful because risk-free matched funding for risky assets does not exist. In testimony to the National Association of Insurance Commissioners, Stéphane Verani, Principal Economist in the System Financial Institutions and Markets section of the Federal Reserve Board, has observed that FABNs increase the connection and thus the correlation between insurers and the financial sector, that maturity and liquidity transformation increases vulnerabilities, and that FABNs are even more vulnerable as their maturity date nears.

108.    As noted in the Financial Times on September 15, 2025, Athene had $64 billion in funding agreements as of June 2025, almost double what it reported in the previous year. This is problematic because FABNs issued by Athene-owned SPVs have absolutely zero reporting obligations, even though the funding agreements themselves are backed by Athene's assets.

109.    The Financial Times further noted that: "In a market downturn, insurers that backed the funding agreements with private loans could struggle to sell those investments at full value and meet their obligations to noteholders. The risk would be amplified if a market downturn coincided with a large batch of notes coming due." This is what is known as a "falling knife" marketplace – the type of market environment that wiped Lehman Brothers out overnight in 2008.

110.    According to the Financial Times, of the $64 billion in total funding agreements that Athene had on its books as of June 2025, $21 billion were in funding agreements sold to the Federal Home Loan Banks ("FHLB"). FHLB funding agreements often require the actual physical transfer of assets to the FHLB, which means that in the falling knife market described above,

Athene could be unable to grab tens of billions in assets that were already physically transferred to the FHLB.

111.    As of year-end 2024, 24.5% of Athene's total assets and 30% of its invested assets were reported as pledged to third parties.

112.    Athene's dramatically inadequate surplus relative to its liabilities, its ownership of Athene's portfolio companies and dependence upon Apollo, its prolific use of affiliated investments, and investment in high risk assets at an excessive and increasing rate relative to its surplus, coupled with the present market and interest rate environment that is further exposing the vulnerabilities of its private equity parent, Apollo, is evidence that Athene is currently at imminent risk of default or a delay in annuity payments to Plaintiffs.

113.    Financial entities that combine U.S. life insurers (Athene), offshore captive reinsurers (Athene Life Re), and asset managers (Athene Asset Management) employ what is called a "Bermuda Triangle Strategy." The insurer (*e.g.*, Athene) firsts builds a block of annuity business, often through a pension buy-out, and then cedes its insurance liabilities to an affiliated offshore reinsurer located in Bermuda or another favorable jurisdiction (*e.g.*, Athene Life Re), thereby freeing up capital for its private debt business. The affiliated asset manager (*e.g.*, Athene Asset Management) then originates, acquires, and manages private debt.

114.    Bermudian reinsurers issue financial statements under Bermuda accounting standards rather than under the United States Statutory Accounting Principles ("U.S. SAP"), which is the required reporting regime for all U.S.-based insurance companies. Under U.S. SAP, insurers are required to file detailed statutory financial statements that report all individual purchases and sales of securities. For fixed-income investments, U.S.-based insurers report all individual stock

and bond purchases and sales by unique identifier for registered securities. By contrast, in Bermuda, Athene's affiliated reinsurers report only aggregate data without individual stock and bond level purchases or sales. Bermuda also allows insurers to invest in assets that would not qualify as suitable under U.S. SAP. According to the U.S. Insurance Guide, "SAP is focused on measuring a reporting entity's ability to pay future claims, while GAAP is more focused on measuring earnings." Under U.S. SAP, assets are valued conservatively, and liabilities are recognized when incurred.

115.    The lack of transparency in the reporting by Athene's Bermuda reinsurers is stark. To illustrate, Athene's current statutory financial statements for its principal U.S. insurer were 3,939 pages long for year-end 2022 and more than 7,700 pages for year-end 2024, whereas the Athene Bermuda entities' consolidated report filed under Bermuda standards for 2022 and 2023 combined was only 72 pages in length.

116.    In addition, Athene's excessive reliance on affiliated, offshore reinsurance today is troublesome for those whose retirement benefits are affected by PRT transactions, for numerous reasons. Whereas arm's-length reinsurance, with pricing set by the marketplace, can improve policyholder security by diversifying and sharing fully transparent risk with strong, independent financial partners, reinsurance with a commonly-owned affiliate is regulatory arbitrage, at best, as pricing is not set by the marketplace. The lack of oversight in offshore jurisdictions leaves the reinsurer's management free to do virtually anything with the extra funds. As a result, captive reinsurance allows insurers to gain multiple advantages, including the ability to price annuities lower than other competitors. That is the case for Athene because both it and its Bermuda-based reinsurer are today owned by Apollo.

117.    Although Bermuda received qualified jurisdiction reciprocal status from the NAIC in 2019, both U.S. regulators and the NAIC still consider insurers' reliance on offshore reinsurance as a current and substantial threat to policyholders. In March 2024, the NAIC and regulators scrutinized the escalating trend of life insurance and annuity reserves being ceded offshore because such practices lack sufficient regulatory oversight and result in a substantial credit risk to the offshore reinsurance sector. The NAIC's Life Actuarial Task Force emphasized the need for improved governance and transparency in these offshore transactions. In October 2024, the NAIC's Life Actuarial Task Force endorsed adopting asset adequacy testing over reinsurance transactions because these transactions lower the transparency of reserves held and the risks associated with the assets supporting the reserves. An industry participant noted during the NAIC meeting that, based on firsthand experience, when a business moved offshore through reinsurance, the amount of assets backing policyholder obligations declined significantly.

118.    An insurance company's surplus measures the total assets the insurance company holds against its total liabilities. When a life insurance company takes credit for reinsurance as part of that surplus, it generally replaces "admitted" assets (those accepted by insurance company examiners) with an IOU from a reinsurance company. If that IOU is from a well-capitalized and unaffiliated reinsurer, policyholders are protected and risk is diversified. When the IOU is with an affiliate, located in a "regulation light" jurisdiction that does not require reporting under U.S. SAP (such as Bermuda), it puts pensioners at substantial risk. Affiliated party reinsurance in the case of Athene is simply not arm's-length, because pricing is set within the same group of companies under common control. It amounts to nothing more than a circular movement of

44

assets and liabilities that pretends to provide security to policyholders while doing the exact opposite.

119.     If a fraction of that reinsurance transferred in 2022 was backed by letters of credit, parental guarantees, or other conditional assets which were evaluated with SAP and consequently disallowed, Athene would face a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene insurance companies represent 40% of Apollo's value.

120.     Moody's recently stated that the movement of reinsurance offshore is "a credit negative for the life insurance sector." A state insurance regulator in Minnesota, who is also an NAIC actuary, voiced concerns with offshore reinsurance because compared to reserves regulated by U.S. SAP, offshore "reserves are substantially lower, disappear, or can even be negative." According to the assistant commissioner of New Jersey's Office of Solvency Regulation, "the level of policyholder protection may be declining" because of the increased use of offshore reinsurance. He also stated that the "ability to greatly reduce reserves appears to be one of the main drivers of the offshore reinsurance boom." Further, when states conduct periodic examinations of insurance companies, these examinations do not even consider offshore reinsurers that are often under-reserved.

121.     While reinsurance with a third-party reinsurer can increase protections for policyholders, the same is not true of offshore affiliated reinsurance. Instead of reinsuring through a third-party reinsurer to diversify risk, Athene "cedes" reinsurance to captive affiliates. As of year-end 2023, Athene reported over $15 billion in assets reinsured with affiliates. Athene's total liabilities reinsured by captives totaled over 5,000% of its surplus.

122.    Beyond traditional reinsurance, Athene engages in significant Modified Coinsurance ("ModCo") transactions that further disguise its true risk level. ModCo is a type of reinsurance. In ModCo transactions, an insurer (the ceding carrier) transfers regulatory capital requirements associated with its asset risks to a reinsurer while retaining the assets themselves. In 2022, Athene reported ModCo transactions totaling $104 billion compared to only $2 billion in surplus. For 2023, Athene reported ModCo transactions totaling over $141 billion relative to only $2.9 billion in surplus. In contrast, other insurers, such as New York Life, reported no ModCo with offshore affiliates in 2022 and 2023.

123.    Conducting ModCo transactions with Bermuda-based captive reinsurers like Athene simply involves swapping insurance risks among commonly controlled companies for the purpose of avoiding U.S. SAP requirements and artificially inflating Risk-Based Capital ("RBC") ratios, which in turn allows Athene to hold a substantially lower amount in minimum required surplus. The RBC ratio measures the amount of capital or surplus an insurer must maintain to pay policyholders (or annuitants) based on its level of risk. RBC ratios are inflated because ModCo arrangements allow Athene to remove risky assets from its RBC ratio. And the use of higher-risk assets enables Athene to value its liabilities at a lower rate. In offloading capital requirements and asset risks to a captive reinsurer through an ultimately circular ModCo transaction, Athene obscures the actual risks associated with the assets involved and is enabled to maintain a lower level of surplus. Athene's manipulation of its RBC ratio is shown through its lower credit ratings relative to traditional insurers, as discussed further below.

124.    Although Athene's total liabilities increased by more than 250% from 2018–2023, the amount of surplus maintained to support its liabilities has not kept pace. On information and

belief, if Athene were to reverse or back out of its $104 billion in ModCo it would be required to increase its minimum required surplus by 400%. Athene's excessive use of offshore affiliated reinsurance, including ModCo, therefore obscures its true financial condition and exposes pensioners, including Plaintiffs, to substantial risk.

125.    As set forth in the chart below, as of year-end 2022 Athene reported more than $129 billion in reinsurance or ModCo exposure to its Bermuda affiliate. New York Life and Northwestern Mutual had no affiliated reinsurance or ModCo whatsoever, and Mass Mutual, Nationwide, and Pacific Life had small exposures to affiliates and ModCo that were not material to their financial condition. Put another way, Athene has more than 30 times its surplus in IOUs with affiliates. If only 5% of the liabilities ceded (transferred) to Bermuda for reinsurance proved problematic, Athene's entire surplus would be wiped out.



126.    Just as Athene is ranked as the very worst of 703 life and annuity companies in the United States when measuring affiliated assets relative to surplus, Athene also ranks 703rd of 703 when comparing its total exposure to reinsurance and ModCo with affiliates to its reported

surplus—meaning that Athene, by this second measure, is also the riskiest annuity provider in the country. Athene's excessive use of offshore affiliated reinsurance, including ModCo, therefore obscures its true financial condition and exposures pensioners, including Plaintiffs, to substantial risk.

127.    Put simply, Athene's use of financial alchemy makes it dramatically under-reserved today.

128.    The interdependence among Athene and its in-house, Bermuda-based reinsurers reporting under Bermudian standards exposes each of these entities to a heightened risk of failure. Should Athene's separate account and then general account be insufficient to cover its liabilities, Athene would be forced to seek payment from its affiliated reinsurer for a portion of its annuity liabilities.

129.    These closely correlated events are tied to Athene's weak financial condition relative to other insurers. As shown through its thin surplus and dramatic increase in liabilities, Athene is dramatically under-reserved relative to peers. In a liquidity crisis or shortfall, it would be entirely dependent on IOUs from its own captive in-house reinsurers. In other words, Athene would be reliant on itself. Furthermore, an inability to satisfy Athene's general account obligations would cause a downgrade in its credit, preventing it from raising funds in the credit markets.

130.    Because Athene houses most of its business in Bermuda, its holding company, Athene Holding, Ltd., primarily relies on dividends from its Bermudian operating companies. To complicate this structure further, Athene Holding, Ltd. is not a pure insurance holding company. It is part of Apollo, which has a large asset management business in addition to Athene's insurance operations.

48

131.    Life insurance and annuity companies maintain surpluses to ensure long-term solvency, but those with captive reinsurers use them to back their liabilities with assets that would not be "admitted" (accepted) by insurance company examiners in their own domiciles. In other words, reinsuring liabilities with captive reinsurers opens up excess capital for profit generation but does not decrease risk. An analysis of Athene's transfer activity among affiliates further illustrates the heightened risk of Athene due to the interdependence among captive affiliates. Athene Annuity Re Ltd of Bermuda had $87 billion in assets on its books in 2020. Circular transactions between Athene and both its offshore and U.S. affiliates totaled $115.7 billion in 2021. If only a fraction of that reinsurance transferred in 2021 was disallowed, Athene would face a funding shortfall. A funding shortfall for Athene would directly impact Apollo because Athene-affiliated insurance companies represent 40% of Apollo's value.

132.    In sum, Athene's use of riskier investments is in stark contrast to traditional insurers. For instance, New York Life maintains substantially more traditional, lower-risk investments than Athene and engages in *no* captive reinsurance.

133.    Apollo has specifically recognized the conflicts of interest that arise in PRT transactions involving its affiliated companies: "[s]uch PRTs could give rise to conflicts of interest, such as determining the purchase price to be paid, the amount of investment management/advisory fees that certain Apollo affiliates charge for managing the underlying pension assets and liabilities[.]" Although there are efforts that can be taken to mitigate these conflicts, Apollo has not taken any such steps.

134.    Apollo specifically "was, in many ways, culturally ill suited" to create and run Athene. Its reputation as "cutthroat" and "bare-knuckled" does not align with the historically

conservative nature of life insurance, which should be primarily concerned with fulfilling policyholder obligations.

135.    Athene's transition out of the life insurance business further contributes to its higher risk as an annuity provider. The provision of life insurance by an insurance provider is considered a natural hedge to its annuities business. In 2013, most of Athene's life insurance business was acquired by Accordia Life and Annuity Company, and by 2016, Athene completely transitioned out of the business. Therefore, this important hedge to Athene's annuity business no longer exists.

**B.    Athene is not creditworthy enough to ensure payment of plaintiff's retirement benefits.**

***1.    Objective measures illustrate that Athene was not the safest annuity available.***

136.    On October 13, 2022, NISA reported the results of a study that evaluated the creditworthiness of nine PRT insurance providers, including Athene.[8] NISA performed its evaluation consistent with the framework outlined by IB 95-1. The report found, among other things, that industry-wide PRT transactions issued by lower-quality annuity providers, like the transfer at issue here, harm annuitants by as much as $5 billion annually through uncompensated

---

[8] David Eichorn, *Pension Risk Transfers (PRT) May Be Transferring Risk to Beneficiaries*, NISA Investment Advisors, LLC (2022), https://www.nisa.com/perspectives/pension-risk-transfers-prt-may-be-transferring-risk-to-beneficiaries/.

credit risk. The NISA Reports quantify the extent to which Athene is neither a safe nor a reasonably

annuity choice for ERISA fiduciaries.



**FIGURE 2. Quantifying the Economic Loss to Beneficiaries (ELB) Due to Credit Risk**

| Issuer | Observed Market Spread | Market Price of Bond's Risks Over Treasuries | Economic Loss to Beneficiaries (ELB) of Choosing Insurer | Market Assessment of Safest Annuity Available |
|---|---|---|---|---|
| (A) NY Life | 74 | 7.4% | 0.0% | CLEAR CANDIDATES |
| (B) Prudential | 76 | 7.6% | 0.2% | |
| (C) MassMutual | 84 | 8.4% | 1.0% | |
| (D) AIG | 102 | 10.2% | 2.8% | POTENTIAL CANDIDATES BUT EXTRA SCRUTINY REQUIRED |
| (E) MetLife | 106 | 10.6% | 3.2% | |
| (F) Principal | 147 | 14.7% | 7.3% | |
| (G) PacLife | 158 | 15.8% | 8.4% | QUESTIONABLE CANDIDATES: DEMANDS EXTENUATING CIRCUMSTANCES |
| (H) F&G | 186 | 18.6% | 11.2% | |
| (I) Athene | 214 | 21.4% | 14.0% | |

Source: Bloomberg, NISA calculations.

137.    To perform the evaluation, NISA computed the credit spread differences "between

insurers into the implied cost that beneficiaries bear to individual insurance companies," finding

"the range of credit risk costs reaching as high as 14%." As shown above NISA quantified the

economic loss to beneficiaries due to credit risk, placing Athene dead last among annuity

providers. The NISA report demonstrates that Athene is a much riskier annuity provider than

traditional options. They reach that conclusion by using the bond market as a measure of risk—a

necessity given the NISA Report's finding that insurance company balance sheets are exceedingly

complex and opaque, especially given the use of Bermudian reinsurers.

138.    The bond market uses spread to measure the creditworthiness of bonds issued by

insurers because there is an inverse relationship between spread and credit rating. As seen in the

chart, Athene had the highest reported spread of 214 basis points ("bps"). The market price of

Athene's bond risk is therefore 21.4% higher than U.S. Treasuries, as compared to the safest

annuity provider analyzed by the NISA Reports (New York Life), whose market price is 7.4% higher than U.S. Treasuries—a 14% gap. Accordingly, all else equal, an investor demands additional compensation for taking on more credit risk to hold one bond that has a higher spread than another bond from a different issuer with a lower spread. But annuitants in a PRT transaction are unable to secure additional compensation for assuming higher risk from a low-quality annuity provider like Athene.

139. In fact, this analysis *understates* the true risks to beneficiaries of a plan shedding benefits liabilities to Athene. The market spread on bonds is set by the marginal buyer, a buyer who by definition would have bond holdings that represent only a small portion of that buyer's overall diversified portfolio. By contrast, the pension of a typical retiree receiving an annuity is a significant portion of their net worth. Such retirees would, if they had a choice (which Plaintiffs did not have in this case), demand additional compensation for Athene's riskiness.

140. Further, Athene was classified by NISA as a "Questionable Candidate" whose selection "demands extenuating circumstances" when assessing whether Athene was among the safest annuity providers in the market. The reported market spread, market price for risks assumed, and the economic loss to annuitants are all significantly higher than the same measures for other annuity providers, including New York Life. At least three providers were found to be "Clear Candidates" for an annuity provider in a PRT transaction. Among annuity providers examined, Athene cannot be considered the "safest available" annuity.

141. IB 95-1 makes clear that "[a]lthough ratings provided by insurance rating services may be a useful factor in evaluating a potential annuity provider, reliance solely on such ratings would not be sufficient to meet the requirement of a thorough and analytical search for an

appropriate annuity provider." In light of this guidance, NISA separately compared the agency

rating of Athene to the market-adjusted implied rating based on the bond market.

FIGURE 1. The Market's View: There is a Very Wide Range of Provider Creditworthiness

| | (A) NY Life | (B) Prudential | (C) MassMutual | (D) AIG | (E) MetLife | (F) Principal | (G) PacLife | (H) F&G | (I) Athene |
|---|---|---|---|---|---|---|---|---|---|
| Agency Rating | AAA | AA- | AA+ | A | AA- | A+ | AA- | A- | A+ |
| Market Implied Rating | AA | AA | AA | A+ | A | A- | BBB+ | BBB | BBB- |
| Observed Market Spread | 74 | 76 | 84 | 102 | 106 | 147 | 158 | 186 | 214 |

Note: In our opinion, when the DOL warned fiduciaries that they may not rely solely on ratings they were making it clear that a high rating would not be an effective safe harbor. For example, a AAA rated insurer is not appropriate when it is known to have higher credit risks. But can lower Agency ratings be ignored when the market is corroborating this assessment, or in this case, taking a dimmer view on the insurers credit quality?

Source: Bloomberg, 8/31/2022 NISA calculations.

142.    The reported range above is the median between the ratings reported by established

rating agencies: Standard & Poor's Rating Services ("S&P"), Moody's Investor Service, Inc.

("Moody's"), and Fitch Ratings ("Fitch"). By agency, the ratings range as follows from highest to

lowest: S&P (AAA to D), Moody's (Aaa to C), and Fitch (AAA to C).

143.    The analysis found that although Athene had an A+ rating (like Executive Life

before its downfall), Athene's implied rating was BBB-, the lowest rating among all reported

annuity providers. Accordingly, reliance on Athene's credit ratings would be insufficient to appropriately evaluate whether Athene offered the safest annuity available.

144. Athene touts its safety based on its A+ credit rating, but this is misleading. There are multiple levels of safety above A+, including AA and AAA. Insurers with greater creditworthiness maintain these comparatively higher credit ratings. These differences in credit ratings have a material impact on insurers' likelihood of default.

145. For instance, Athene maintains an A1 rating issued by Moody's (or A+ for S&P), in contrast to New York Life's Moody's-issued Aaa (or AAA for S&P). Moody's reported average cumulative issuer-weighted default rates based on these credit ratings from 1970 through 2021, and the differences are stark. Over a 20-year time horizon, which is likely an even shorter horizon than would be relevant to the obligations to many pensioners, riskier insurers' default rates become apparent. While Moody's AAA ratings default at a rate of 0.7%, the default rate for its A ratings is almost *seven* times higher at 5.0%. It can be expected that if extended to a 30-year time horizon, this differential would grow exponentially. This differential is yet another indicator of the risk that pensioners have assumed with Athene.

146. That Athene's default risk according to Moody's alone is 5% is striking, because the Moody's ratings described above are generous to Athene and its risk of default is substantially higher than 5% based on Athene's practices alleged herein—just as Executive Life's A+ credit rating did not accurately reflect its risk before failure.

147. Put simply, Athene today is, according to multiple objective measures, the least safe annuity provider—even among the category of least safe annuity providers of those analyzed in the NISA Report. The annuities purchased by Lumen were thus not safe, much less the safest

annuities available. The Lumen Plan participants whose benefits have been annuitized through the PRT with Athene receive none of the upside of Athene's inherently risky "value proposition." The risk posed by Athene could be worthwhile to Plan participants, at least theoretically, if they were to enjoy increased benefits that compensated them for Athene's risk of failure. But that is not the case for Plan participants, and it is never the case for defined benefit plan participants, because their benefits are fixed.

### 2. *Even if insurance rating services' opinions were dispositive, Athene was not the safest available annuity provider.*

148.    On October 6, 2023, New York Life received among the highest credit ratings based on its leading market position, its diversified portfolio and extremely strong capital levels. On the same date, Athene received much lower ratings. Because of Athene's non-traditional asset mix, Athene likely would experience realized losses in a stressed market environment. Athene's ratings were skewed because of a lack of transparency into its offshore captive reinsurance affiliates in Bermuda. Athene's offshore captive reinsurance scheme also allows Athene to access third-party capital to support both organic and inorganic growth. If Athene ceded any business to its offshore captive reinsurance affiliates, any underperformance of that ceded business would most likely lead to Athene's undercapitalization, as Athene ultimately remains liable for honoring the obligations underlying the ceded business.

149.    On November 17, 2023, New York Life received a very high rating based on its ability to pay its claims and repay its obligations promptly. New York Life's overall governance model is grounded in its mutual ownership structure, prioritizing conservative risk and governance practices. New York Life is strongly committed to its policyholders, writing business in which risks are borne by both New York Life and its customers—and in which customers are

compensated for that risk in the form of dividend payments. Additionally, New York Life's management is dedicated to its policyholder-oriented principles, which are aligned with the interests of New York Life's other creditors. In contrast, on July 17, 2023, Athene received a much lower rating because: (1) Athene's portfolio has an unusually high concentration of senior and subordinated structured assets (like ABS and CLOs) compared with other similarly rated insurance peers, which could jeopardize Athene's solvency in the event of an interest rate hike; and (2) Athene's rapid expansion into pension risk transfers has increased Athene's asset and liability management risk (*i.e.*, a mismatch between liabilities due and assets on hand to pay those liabilities).

### 3. *Athene's risky "separate account" is not "separate" and will not protect Lumen pensioners.*

150.    A so-called "separate account" provides a pool of assets that are the first to be drawn upon to fund an annuity. But the relative safety of that pool of assets is far lower for Athene's annuitants than for traditional, highly-rated insurers such as New York Life or Metropolitan Life.

151.    Athene's use of a separate account for its liability to Lumen annuitants in no way eliminates the far greater risk of Athene's annuities because *all* large, traditional life insurers use separate accounts in funding pension risk transfers. Thus, the safety of Athene's separate accounts must be compared to those of large, conservative life insurance companies. Instead of the most highly-rated corporate bonds and U.S. Treasury notes used by traditional life insurers, Athene simply placed the much riskier assets of its general account in the Lumen separate account.

152.    But the heightened risk of Athene's separate account funding the Lumen annuities (compared to that of highly-rated large insurers) is not limited to the class of assets in that account. Because Athene projected higher *returns* on those assets, Athene placed a significantly smaller

amount of assets in the separate account to fund Plaintiffs' Lumen annuities than large, highly-rated insurers would have placed in their separate account to fund a comparable set of benefits.

153.    Such accounts must provide for an amount of assets which, with fees and profits, in addition to annual payments to annuitants, will be used up when the last annuity payment is made according to life expectancy tables. This occurs when the last annuitant dies. In order to defease – that is, to fund – an annual annuity liability of $1 million, the predicted return must be calculated. Athene projected a much higher hypothetical return of at least 6.5% from its riskier assets in the separate account than the return projected by large, highly-rated life insurance companies. This higher projected return resulted in Athene placing a much smaller pool of assets in the separate account for Lumen annuitants. For example, for an annual annuity liability of $1 million for 40 years, a projected return of 6.5% would require only $14.16 million in assets to be placed in the separate account.

154.    In contrast, traditional large life insurance companies such as New York Life and Metropolitan Life, which have higher ratings than Athene, project lower returns of approximately 4% because they hold secure, much less risky investments in their separate accounts. For the same annual annuity liability of $1 million for 40 years, a projected return of 4% would require $19.8 million—over $6.5 million or almost 50% more than Athene—to be placed in the separate account of these insurers.

155.    The pool of assets placed in the separate account of Athene is therefore not only a far smaller pool of assets to protect annuitants, but that much smaller pool is also made up of far riskier assets.

156.    For a larger amount of annual annuity liabilities, the same proportions apply. For example, in order to fund an annual annuity liability of $25 million, large secure insurers' projected return of 4% would require $495 million in the separate account. In contrast, Athene's projected return of 6.5% would require only $365 million in the separate account.

157.    In addition, Athene's "separate account" used to pay benefits to Lumen retirees is not truly "ring-fenced" or insulated from Athene's general liabilities. According to the GACs issued by Athene for other similar PRTs, the separate account holds assets supporting the contract. However, the separate account assets may *also* be used to support Athene's payment obligations under other, separate GACs issued by Athene. And on a quarterly basis (but no less frequently than annually), Athene may also withdraw assets from the separate account and transfer them to its general account if the market value of the assets in the separate account exceeds Athene's liabilities under the GAC.

158.    Even Athene's own description of its separate account suggests the account is not truly separate. Paragraph 1.4 of a GAC in a similar PRT defines the "Separate Account that Supports this Contract" as follows:[9]

> During the period starting on the Effective Date and ending on the consummation of a Small Account Conversion, the Dedicated Account shall be the "Separate Account" supporting Annuity Payments hereunder. After consummation of a Small Account Conversion, the Commingled Account shall be the "Separate Account" supporting annuity Payment hereunder.

159.    What Athene describes as a "separate account" is not really separate at all. In fact, Athene reports its separate account assets on a commingled basis. That means that Athene's

---

[9] *Piercy et. al. v. AT&T, Inc. et. al.*, No. 24-10608-NMG, Dkt. 78-3 at 18 (§ 1.4) (D. Mass. Dec. 6, 2024).

separate account supports liabilities for *multiple* PRT deals, not just the subject transaction with Lumen.

160.    This commingling can be seen in Athene's own financial statements. To begin with, Athene reported surplus of only $879,326,237 in its separate accounts as of year-end 2022. For the same reporting period, Athene reported close to $40 billion in separate account liabilities. The notion that Athene's separate account structure provides meaningful protection to Plaintiffs is therefore a fiction.

161.    Athene then reported total surplus in its General Account of $2,057,261,385 as of year-end 2022 (first table). But $879 million of that surplus came from its supposedly separate accounts (second and third tables, totaling $879 million). Athene therefore used its commingled separate account surplus to bolster the reported surplus in Athene's general account.

ANNUAL STATEMENT FOR THE YEAR 2022 OF THE SEPARATE ACCOUNTS OF THE Athene Annuity a

## LIABILITIES AND SURPLUS

| | | Current Year | |
|---|---|---|---|
| | 1<br>General Account<br>Basis | 2<br>Fair Value<br>Basis | 3<br>Total<br>(Cols. 1 + 2) |
| 17.  Total liabilities (including $ ............... 43,947,825  due or accrued net<br>      transfers to or (from) the general account) ............................ | 40,051,993,295 | 22,583,895 | 40,074,577,190 |
| 18.  Contributed surplus ............................................................... | 768,212,463 | | 768,212,463 |
| 19.  Aggregate write-ins for special surplus funds ........................ | | | |
| 20.  Unassigned funds ................................................................. | (27,652,601) | | (27,652,601) |
| 21.  Surplus (Lines 18 through 20) .............................................. | 740,559,862 | | 740,559,862 |
| 22.  Totals | 40,792,553,157 | 22,583,895 | 40,815,137,052 |

| | |
|---|---|
| 36.2 ............................ shares preferred (value included in Line 30 $ ..................... ) ........................ | |
| 37.  Surplus (Total Lines 31+32+33+34+35-36) (including $ ............... 879,326,237  in Separate Accounts Statement) ....... | 2,057,261,385 |
| 38.  Totals of Lines 29, 30 and 37 (Page 4, Line 55) ............................................................................................. | 2,067,261,385 |
| 39.  Totals of Lines 28 and 38 (Page 2, Line 28, Col. 3) ......................................................................................... | 145,599,630,080 |

### 4. *Athene relies on unreliable private letter ratings.*

162. Since at least 2017, Athene has relied on unreliable and misleading "private letter ratings" from smaller private credit rating agencies, which should have been a cause of serious concern to Defendants when they decided to annuitize Plaintiffs' pension benefits.

163. The CLOs in which Athene invests are a type of structured debt divided into different tranches with varying risks and returns, so their creation depends on private letter ratings ("PLRs") from private credit ratings agencies. These private rating agencies apply less stringent standards for ratings than public ratings from the Securities Valuation Office ("SVO") of the NAIC and those provided by major credit reporting agencies, such as S&P, Moody's, and Fitch. There are significant discrepancies among securities ratings provided by private ratings agencies—Kroll Bond Rating Agency ("KBRA"), DBRS Inc. ("DBRS"), and Morningstar—and those by the major ratings agencies—S&P, Moody's, and Fitch. Athene obtained ratings from both KBRA and DBRS each year from 2017 through 2023.

164. In 2019, the Wall Street Journal ("WSJ") reported the same discrepancies among structured securities ratings, including those of CLOs, between the major ratings agencies and the "challenger" ratings agencies—DBRS, KBRA, and Morningstar. Across most structured-finance segments, challengers were more likely to provide higher grades than the major ratings agencies on the same bonds. This resulted in the classification of a bond as "junk" by major rating agencies whereas the smaller, private credit rating agencies would rate it as very safe (AAA). The NAIC found similar discrepancies: it reported that as of year-end 2021, small credit rating providers provided PLRs on 83% of the privately rated securities owned by U.S. insurance companies. Overall, the NAIC found that private ratings by large credit rating providers were, on average, 1.3

notches lower than those provided by their counterparts for the same security, while private ratings provided by small credit rating providers were 1.2 notches higher. Notably, unlike PLRs, public ratings provided by small credit rating providers were largely comparable to those provided by other ratings agencies. These differences in credit ratings have an adverse impact on capital requirements under the RBC framework. Private letter ratings that carry a higher credit rating than the SVO designation, for example, result in lower RBC requirements, which may lead to the insurer being undercapitalized relative to the actual risk in its portfolio.

165.   This problem persists because bond issuers can actually pay for their ratings by choosing to purchase ratings from only those agencies which are more likely to issue higher ratings. According to the WSJ, there is an added incentive to hire the most lenient rating firm, because interest payments are lower on higher-rated bonds. And as major ratings agencies lose out on business to more lenient challenger ratings agencies, they adjust their standards downwards so that they can continue to compete. These ratings are important because a higher-rated structured security requires lower levels of capital to be held by the insurer.

166.   Both KBRA and DBRS have been the subject of investigations by the SEC regarding their rating practices, resulting in millions of dollars in fines. One investigation unveiled that KBRA's ratings failed to establish, maintain, enforce, and document the required policies and procedures surrounding their ratings of certain CLOs, resulting in inaccurate ratings that did not fully account for cash flows payable to noteholders and which would almost certainly pose a threat to policyholders in the case of insolvency.

167.   The SEC also found that DBRS violated Section 17(a)(1) of the Exchange Act and Rule 17g-2(b)(7) thereunder for off-channel discussions of internal credit rating practices, as well

as discussions of adjustments to the DBRS commercial mortgage-backed securities rating model. The SEC found that company cell phones had been wiped in 2022 under the DBRS's direction without proper preservation, and DBRS paid millions in civil penalties.

168.    Through one settlement, KBRA's ratings failed to adequately assess the probability that the issuers will default or otherwise make payments in accordance with the terms of the security. Despite years of documented wrongdoing by KBRA and DBRS and their extensive failures to comply with SEC credit rating policies and procedures, Athene continues to retain both companies for rating risky securities in its portfolio. Indeed, KBRA and DBRS provided private rating services to Athene from 2017 through 2023. Athene's reliance on these ratings agencies is a red flag, which Defendants either ignored or failed to identify, by failing to properly vet Athene before selecting it as the annuity provider.

### 5. *Athene has been the subject of investigation by insurance regulators and was found to have violated the law.*

169.    Athene has been investigated by the State of New York for misconduct regarding its PRT business and was found to have violated New York law. Relative to other states, New York state maintains some of the strictest standards on insurers. In January 2019, the New York Department of Financial Services investigated Athene Annuity and Life Company and Athene Holding Ltd., concluding that Athene Annuity and Life Company violated New York law by transacting insurance business related to its PRT business without a license from the State. As a result of the investigation, Athene Annuity and Life Company and Athene Holding Ltd. were jointly ordered to pay a $45 million civil penalty and satisfy other conditions. These other conditions included, among other things, prohibiting Athene Annuity and Life Company from soliciting, negotiating, selling, or servicing any PRT transactions, group annuity contracts, or related certificates in New York, except through its subsidiary, Athene New York.

### 6. *Recent developments have greatly increased the imminent risk of Athene delay in annuity payments or default.*

170.    Jamie Tucker, head of U.S Life Insurance for Fitch Ratings, stated in early 2025 that his biggest fear for 2025 was "a severe downturn in credit markets."[10] "Given the increased allocation to less liquid and increasingly complex securities, many of which have not been truly tested by a downturn, we have questions on how some of these assets will perform."[11] Others, including Tim Zawacki, S&P Global Market Intelligence analyst, echoed Mr. Tucker's worries

---

[10] Aaron Smith, *The Industry's Biggest Fears for 2025: Worries about the potential for market shocks, heightened mortality and technological struggles top the list*, LIFE ANNUITY SPECIALIST, Jan. 15, 2025.

[11] *Id.*

"about how carriers' new investment strategies will fare in the face of an economic shock" or "economic black swan event."[12] Michael Leonard, chief economist and data scientist at the Insurance Information Institute, expressed concern about "a drop in profitability and income from [life insurers'] assets under management."[13] These are concerns about life insurers with risky assets generally. Athene's actions exacerbate these increasing industry risks, and the downturn in the credit markets referenced by Messrs. Tucker and Zawacki—the "economic shock" or "black swan event"—is currently unfolding in 2025.

171.    The Wall Street Journal ("WSJ") reported on April 17, 2025 that the shares of Athene's parent, with whom Athene investments are invested and intertwined, "are down 20% or more this year, far worse than the S&P 500's sharp losses."[14] The chairman of private equity at Bain Capital stated therein: "We aren't even in a recession now, and we're already at a point where things are incredibly challenging."[15]

172.    A WSJ article the next day on April 18, 2025 raised the alarm that private equity firms own 29,000 companies "that they can't unload" because of market conditions and high interest rates, and that "a party may be winding down."[16] On April 22, 2025, the WSJ addressed

---

[12] *Id.*

[13] *Id.*

[14] Matt Wirz and Miriam Gottfried, *Private Equity World Engulfed by Perfect Storm*, WALL ST. J., Apr. 17, 2025, *available at* https://www.wsj.com/finance/investing/private-equity-world-engulfed-by-perfect-storm-2a2da2ad.

[15] *Id.*

[16] Jason Zweig, *Don't Buy Into This Easy Fix for Stock-Market Craziness*, WALL ST. J., Apr. 18, 2025, *available at* https://www.wsj.com/finance/investing/stock-market-craziness-alternative-funds-7df17b9c?gaa_at=eafs&gaa_n=AWEtsqfmn-oAxJlPzzkI9RcTCuNRwc1Z-EiL9ed4Rq--YNxNKKFgDHkUDhpM&gaa_ts=690a669b&gaa_sig=QxEWMTIKOpF24kcaN5bEYQfxblA23UKdVGYmBqnPSj53r-h7uuOlLkQtG4Rk2Jga_pq6Wf95uZspHEZFdvzbmg%3D%3D.

the fact that the illiquidity in private equity investments in the current financial environment and high interest rates is forcing sales of assets in a down market.

173.    What makes this general concern surrounding private equity even more ominous in the case of Athene and its parent, Apollo, is that even before these recent developments, Apollo's default rate since 2022 for the companies it owns was almost 25%, according to Moody's. *See supra.*

174.    Coupled with the fact that about 50% of Athene's investments are in Apollo companies, the heavy debt of Apollo companies now operating in a high interest rate environment, the inability to sell many of Apollo's investments, and very recent market conditions, Athene is at grave risk of default or delay in annuity payments to Plaintiffs.

### 7.    *Recently failed insurers engaged in similar higher-risk practices.*

175.    Athene's practices closely resemble those of recently failed insurers in several critical respects, further illustrating the immediacy of the risk to Plaintiffs. These practices have been recognized by industry professionals as having caused past failures and creating a substantial likelihood of default or insolvency.

176.    In 2024, four insurance companies failed: Columbian Life Insurance Company ("Columbian Life"), Columbian Mutual Life Insurance Company ("Columbian Mutual"), PHL Variable (noted *supra*), and 777 Reinsurance Ltd. ("777 Re"). Their failures demonstrate that the same practices that caused Executive Life's failure persist, including surplus inadequacy, risky financial practices, and inadequate risk management, among others.

177.    Columbian Life was part of a complex network of affiliated entities under parent company Columbian Mutual. Like Athene, Columbian Life and its affiliates held complicated and

65

intertwined financial obligations to one another and engaged in multiple levels of offshore reinsurance. Ultimately, these circular and affiliated transactions, coupled with the company's declining financial health and inadequate reserves, led to its insolvency. Columbian Mutual's complex and opaque structure and involvement in affiliated transactions allowed the company to disguise its growing financial strain until regulatory intervention was both inevitable and necessary.

178.    Prior to its collapse at year-end 2023, Columbian Life had only $9.5 million in total surplus, yet it was relying on its direct parent, Columbian Mutual, for $590 million in affiliated reinsurance. Columbian Life's surplus, not even 2% of the amount of the affiliated reinsurance it received from Columbia Mutual, is entirely too thin relative to its amount of affiliated reinsurance.

179.    In fact, Athene's surplus-to-liability ratio is actually *below* two recently failed insurers: Columbian Life and Columbian Mutual. Columbian Life and Columbian Mutual actually also had *higher* surplus-to-liability ratios, 3.01% and 2.10%, respectively. Thus, Columbia Life's ratio was over twice that of Athene's, and Columbian Mutual's was almost one and a half times as great as Athene's. As of year-end 2022, the last year that PHL Variable reported a positive surplus, its surplus-to-liability ratio was 1.03%. As previously indicated, all four ratios are dramatically below the national average of 7.49%.

180.    Additionally, similar to these failed insurance companies, Athene engages in affiliated reinsurance – which does not diversify risk – that far exceeds its surplus. As of December 31, 2023, Athene's use of affiliated reinsurance was over $155 billion, an astounding *fifty-four* times the amount of its surplus. This is ominously comparable to Columbian Life's use of affiliated reinsurance, which was *sixty* times the amount of its surplus, Columbian Mutual's, which was

*twenty* times, and PHL Variable's, which was *ninety* times. In contrast, New York Life does not engage in *any* affiliated reinsurance; it and other traditional long-standing life insurance companies diversify their risk by utilizing insurers who are unaffiliated third parties.

181.    Before its takeover by regulators, an independent actuarial analysis by the New York Department of Financial Services found Columbian Life's reserves to be significantly deficient. The company needed to increase its reserves by $104 million. Shortly thereafter, Columbian Life was placed into rehabilitation by the Illinois Department of Insurance. In August 2024, Columbian Mutual was placed into rehabilitation in New York as well, and their policyholders remain at substantial risk. The rehabilitator assigned to Columbian Life is currently evaluating the feasibility of a rehabilitation plan and is coordinating with state insurance guaranty associations in the event of a future liquidation. The Illinois rehabilitator has the authority to issue a moratorium on the payment of policy benefits to Columbia Life.

182.    PHL Variable faced financial challenges similar to those faced by Columbian Life, including, among other things, underperforming investments and a prolonged low-interest-rate environment. PHL Variable attempted to stabilize itself through reinsurance transactions, including with its captives. When these efforts proved futile, regulators took over PHL Variable and initiated rehabilitation proceedings to protect policyholders and stabilize the company. As part of the rehabilitation proceedings, in June 2024 the court ordered a moratorium on certain policy payments and set a maximum payment of $250,000 in the aggregate for an annuitant even if that annuitant was originally entitled to a higher payment under their contract with PHL. As discussed, Athene engages in the same risky practice of using an excessive amount of affiliated reinsurance relative to its surplus.

183.    A common theme among collapsing insurers is the pursuit of higher returns through less liquid, more volatile assets and the use of opaque, affiliated reinsurance transactions. These strategies can generate short-term profits but expose insurers, like Athene, to substantial risk if market conditions change, leaving them unable to liquidate assets to meet policyholder demands.

184.    Much like other failed insurers, 777 Re, a Bermuda-based reinsurance entity, engaged in complex and opaque financial arrangements with affiliates. Through these transactions, 777 Re's parent company (777 Partners) shifted liabilities off its balance sheet and misled regulators and investors into believing that it was financially sound. In reality, the affiliated reinsurance transactions just obscured 777 Partner's significant exposure and perilous financial status. Similar to Columbian Mutual, policyholders remain exposed.

185.    In addition to offshore reinsurance, 777 Re's portfolio contained high levels of risky and illiquid assets for the sake of higher returns. This strategy proved unsustainable, particularly when market conditions shifted, and contributed greatly to 777 Re's insolvency.

186.    After 777 Re ceased insurance activities in mid-2024, its rating was withdrawn by AM Best. When this happened, two insurance firms, Atlantic Coast Life Insurance and Sentinel Security Life Insurance, owned by Advantage Capital Partners ("A-Cap"), had to reclaim assets previously ceded to 777 Re to reduce their exposure to the dissolved 777 Re.[17] In 2023, A-Cap and its subsidiaries sold approximately $1.7 billion in annuity contracts, and 777 Re held approximately $1 billion of A-Cap insurers' business.[18]

---

[17] Jacob Adelman, *Annuities Are Soaring in Popularity. They're Not All as Safe as They Seem.*, BARRONS, June 7, 2024, *available at* https://www.barrons.com/articles/annuities-risks-retirement-sentinel-atlantic-coast-a-cap-ec9dbba5?mod=bol-social-tw.
[18] *Id.*

187.     As is the case with A-Cap and 777 Re, when an "insurer's reinsurance partner fails, there's 'the potential for contagion,' since the insolvency could leave the insurer short of the assets it needs to support its own liabilities."[19] On March 21, 2025, the Utah Insurance Commissioners requested a court enter a rehabilitation order for Sentinel Security, after already having banned the insurer from writing new life insurance as of the end of 2024.[20] The Utah insurance commissioner said, "[t]his Petition results from a years-long history of self-dealing, conflicts of interest, and obfuscation" by A-Cap. The obfuscation, among other things, resulted from A-Cap's dealings with an opaque offshore reinsurer in 777 Re, and now A-Cap must deal with the fall out of having those liabilities back on its books because of 777 Re's insolvency and the ensuing rehabilitation proceedings that leave its policyholders exposed.

188.     While these strategies of engaging in offshore, affiliated reinsurance transactions and holding high concentrations of risky assets can improve a company's financial position on paper and allow it to boast high returns, the risks introduced are significant, especially for those reinsurers that are undercapitalized and domiciled offshore.

**IV.     State Street was not independent because it has been a major shareholder of Lumen since 2019, and was a major shareholder of Apollo.**

189.     State Street and its affiliates have held substantial ownership of Lumen's common securities since 2007, consistently holding more than five percent of all of Lumen's outstanding, publicly traded equity securities for most years since 2014. Holders of publicly traded securities

---

[19] *Id.*

[20] John Hilton, *Utah regulators ask court to place Sentinel Security Life into rehab*, INS. NEWSNET, March 26, 2026, *available at* https://insurancenewsnet.com/innarticle/utah-regulators- ask-court-to-place-sentinel-security-life-into-rehab.

are entitled to vote on matters affecting corporate governance, including members of the board, shareholder resolutions, and the like. According to SEC rules, any person who acquires a beneficial ownership interest of more than five percent of certain classes of certain equity securities must file a Schedule 13 annually with the SEC to ensure that investors and the market have accurate information about potential changes in corporate control. Given these requirements and State Street's significant ownership interest in Lumen, State Street was required to file Schedules 13 concerning its Lumen holdings for all years between 2014–2023, inclusive, except 2018, for which State Street did not file such a Schedule for its Lumen holdings.

190.    From 2014 through 2017, State Street held between 30.5 million and 51.1 million common Lumen shares, an ownership interest ranging between 4.8% and 5.8% of Lumen, valued between approximately $734.1 million and $1.3 billion (*i.e.*, between approximately $961.0 million and $1.7 billion in 2024 dollars). From 2019 through 2023, State Street held between 53.1 million and 61.5 million common Lumen shares, an ownership interest ranging between 5.2% and 6.0% of Lumen, valued between approximately $97.3 million and $797.4 million (*i.e.*, between approximately $100.3 million and $979.92 million in 2024 dollars).

191.    State Street is also one of the largest shareholders of Apollo. As of mid-year 2022, State Street was the sixth largest institutional investor in Apollo, owning 8.9 million shares valued at $437 million. And as of December 31, 2023, State Street was the seventh largest institutional investor of Apollo, owning 10.31 million shares valued at $1.1 billion. State Street also provides custodial services for Athene insurance products.

192.    Because State Street held such significant positions in Lumen and Apollo, it had a self-interest in increasing the value of its equity positions in both companies. State Street had an

interest in favoring Lumen by selecting an annuity provider that provided reduced premium payments relative to established and reputable insurance providers, thereby providing a direct financial benefit to Lumen and its shareholders. Like most publicly traded companies, Lumen holds an annual shareholders' meeting at which its shareholders, including State Street, are entitled to vote on a wide range of corporate strategic and governance issues, including those relating to the appointment, composition, and pay of board members. Shareholders, including proxy shareholders, generally receive ballots each year that also include proposals for strategic investments. State Street's significant holdings in Lumen's common stock before, during, and after the October 2021 PRT gave State Street the ability to influence Lumen's strategies and activities.

193.    Studies show that large shareholders (like State Street) have an incentive to provide favorable advice for the management of public companies that are their clients (like Lumen) than for others that are not, and such incentives often exist where, as here, there is a side-agreement between the large shareholder and the public company at issue. Public companies (like Lumen) are incentivized to buy products and services from their large shareholders (like State Street) so that the large shareholders maintain or increase their ownership positions. These relationships incentivize large shareholders to exercise their proxy voting power to favor management-friendly resolutions. Therefore, State Street did not act as an "independent" fiduciary with respect to the October 2021 PRT transaction. Instead, State Street's interests were directly aligned with the Lumen Defendants' and Athene's: to maximize profit, even if this meant choosing an annuity

71

provider that did not offer the safest annuity product available and did not have the highest claims paying ability.

### V. Lumen's business dealings with Apollo and the subsequent Lumen-State Street-Athene PRT in October 2021.

194.    On August 3, 2021, Lumen announced that it had entered into an agreement with Apollo and Apollo's affiliates, pursuant to which Apollo and its affiliates would acquire Lumen's Local Incumbent Carrier assets and operations in 20 states for $7.5 billion. The deal was completed on October 3, 2022. The transaction was one of two divestitures designed to help Lumen rebound from a long string of financial struggles and return to financial growth.

195.    The National Digital Inclusion Alliance ("NDIA"), Public Knowledge, and the Communication Workers of America ("CWA") expressed significant concerns with the deal, including concerns over the lack of "mandatory and enforceable transfer conditions that address fiber investment, legacy service maintenance, [and] employee and plant retirement" that would address potential public interest harms. CWA cited, as a precautionary example, Apollo's 2016 takeover of Warrior Met Coal. In that takeover, Apollo "devastated the company's workforce by cutting pay, benefits, and terminating collective bargaining and pension agreements" while at the same time taking on "massive debt while distributing huge dividends to investors." In fact, at the time the Lumen/Apollo transaction was announced, Warrior Met Coal workers were four months into a strike to restore wages, benefits, and fair work processes that they had lost while Warrior Met Coal owners, and primarily Apollo, enjoyed $1.4 billion in dividends. Lumen chose to prioritize its shareholders and its bottom line while its workers feared what could become of their job and financial security.

72

196.    On October 29, 2021, Lumen announced to its shareholders that, ten days earlier, on October 19, 2021, Lumen, "as sponsor of the [Plan] . . . along with the Plan's independent fiduciary, entered into an agreement" to effectuate a pension risk transfer of "approximately $1.4 billion of the Plan's pension liabilities." There was an irrevocable transfer of "future Plan benefit obligations for approximately 22,600 U.S. Lumen participants in payment . . . effective December 31, 2021." The transaction was funded "entirely by existing Combined Plan assets." "The final reconciliation process was completed in May, 2022," and Lumen's Form 5500 for 2021 reflected "a refund to the Combined Plan of $13.9 million," recorded in "Other Receivables."

197.    The Lumen Defendants appointed State Street as the independent fiduciary charged with choosing an annuity provider for the October 2021 PRT transaction, thereby assisting Lumen in offloading its pension liabilities. At all relevant times, State Street represented that its services include "[i]nsurance provider selection for annuitizing defined benefit plans (in accordance with the Department of Labor's Interpretive Bulletin 95-1)[.]" A key service offered by State Street's Independent Fiduciary Services team—and, according to State Street, one of the leading "reasons why companies decide to hire" purportedly independent fiduciaries like it—is that State Street's role as a third party and allegedly "neutral" advisor "may help in the event of litigation."[21] But as indicated *supra*, State Street did not act as a neutral advisor on behalf of Lumen retirees and their beneficiaries.

---

[21] STATE STREET GLOBAL ADVISORS, *DC DNA: How Independent Fiduciary Services Evolved and What It Means Today* (State Street Corp., Oct. 31, 2023), https://www.ssga.com/us/en/institutional/ic/insights/how-independent-fiduciary-services-evolved/.

198.     When State Street represents that hiring it "may help in the event of litigation," it means that engaging it to assist with annuitization helps provide employers with supposed legal cover in the form of a justification that IB 95-1 and ERISA are complied with when State Street plays a role in the selection of an annuity provider. In fact, State Street has conceded the applicability of Interpretive Bulletin 95-1 to annuitizations like the one at issue here, in both public and legally binding documents.

199.     State Street represents, for example, that its "team of independent fiduciary services specialists continue to support clients seeking to transfer liabilities to insurance companies in the form of annuitizations" in light of the new insurance landscape that, according to State Street, has "increased 'safest available annuity' options available to independent fiduciaries and other fiduciaries." *Id*. (quoting and citing IB 95-1).

200.     State Street has represented in its engagement agreements for similar Pension Risk Transfers that it will perform its work in selecting an annuity provider "in accordance and compliance with ERISA, including the requirements of the U.S. Department of Labor's IB 95-1."

201.     As referenced in Lumen's shareholder announcement, Lumen, acting on State Street's advice, entered into an agreement with Athene on or about October 19, 2021. Through the agreement, Lumen purchased the GAC from Athene in exchange for Athene assuming approximately $1.4 billion of the Plan's defined benefit pension obligations. The GAC covers approximately 22,600 Plan participants and beneficiaries, none of whom had any say in the transfer of their benefits to Athene.

202.     On August 19, 2022, shortly after the PRT at issue, the Federal Communications Commission approved the August 2021 Lumen-Apollo agreement pursuant to which Lumen also

received $7.5 billion from Apollo, Athene's parent, when Lumen ceded its operations in 20 U.S. states to Apollo and its affiliates.

203.   Athene is now solely responsible for paying the pension benefits of the Plan participants and beneficiaries covered by the transaction, who are no longer subject to ERISA's protections for employee benefits. Affected pensioners are those whose monthly payments are less than or equal to $1,070 per month and whose payments from Lumen began on or before June 1, 2021. Following the PRT transaction, Athene began making annuity payments to Lumen pensioners and their beneficiaries on or after December 31, 2021.

204.   As a result of the transaction, the value of the annuity benefits Plaintiffs are now receiving from Athene is substantially less than the value of the pension benefits they were receiving, and were entitled to receive, from Lumen. Even though Lumen retirees had no ability to choose their annuity provider, they cannot withdraw their benefits. Athene's obligations are irrevocable. Thus, pensioners with a lower risk appetite did not have the option to transfer their benefits to a safer, less risky alternative.

## VI.   Defendants acted in their own self-interest by transferring Lumen's pension obligations to Athene.

205.   Defendants breached their strict fiduciary duty to Plaintiffs and the class by selecting, and then causing the offloading of billions of dollars of Plan participants' retirement benefits to Athene. They failed to select the safest annuity provider available. They placed their own monetary interests ahead of Plaintiffs' interests and those of other similarly situated Lumen retirees and beneficiaries and failed to conduct a thorough and independent investigation of available annuity providers for the Plan. Relative to traditional annuity providers, Athene invests in far riskier assets.

206.     In a market with no shortage of stable and established annuity providers, no prudent and loyal fiduciary under the circumstances would have offloaded billions of dollars in participants' retirement benefits to Athene. There were numerous factors that would and should have led a fiduciary to conclude that Athene was not the safest annuity provider available: (i) Athene lacks a sufficient track record to be entrusted with guaranteeing such a massive amount of pension liabilities; (ii) Athene today is, compared to traditional providers, invested in riskier assets to support participants' payments; (iii) Athene's risk is increased by its reinsurance of annuities with offshore companies affiliated with Athene, which are not as transparent or required to set aside as much capital as U.S.-based insurers; (iv) Athene employs questionable accounting strategies to overvalue its assets and understate its liabilities; (v) Athene uses excessive amounts of ModCo to artificially inflate its RBC ratio; and (vi) the risks inherent in Athene's strategies are magnified by unstable economic conditions.

207.     When advising the Lumen Defendants to offload their pension obligations to Athene, State Street was held to the same stringent fiduciary standards as the Lumen Defendants owed to the Plan. State Street selected or recommended Athene as the annuity provider in the PRT in violation of its obligations as an independent fiduciary to the Plan. At all relevant times, State Street's role in PRT transactions has been critical to Athene's success. For 2021, the Lumen and State Street's PRT represented approximately 14% of Athene's sales, or $1.4 billion of the $10.1 billion Athene reported for pension group annuity sales. Given the corporate relationships between State Street, Athene and Athene's affiliates, and the numerous factors that would have led a prudent fiduciary to reject Athene as an annuity provider, it is evident that State Street selected or

recommended Athene without conducting an objective evaluation of available annuity providers or, alternatively, after ignoring the risks posed by Athene.

208.    The risks posed by Athene in 2021 and years prior would have been known and readily ascertainable to any prudent and loyal fiduciary. Without conducting an independent, impartial investigation aimed at identifying the safest annuity provider with the highest claims-paying ability available, Defendants did not and could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of Plaintiffs and similarly situated Athene retirees.

209.    Although the Lumen Defendants ostensibly hired State Street as an independent fiduciary to select Athene, the Lumen Defendants maintained full responsibility as appointing fiduciaries to monitor State Street to ensure that it carried out its fiduciary obligations loyally and prudently. A monitoring fiduciary must take prompt and effective action to protect the plan and its participants when the delegate fails to discharge its duties. The Lumen Defendants also had a duty to prevent any fiduciary breach by State Street in the selection of Athene as the annuity provider and to ensure that State Street was performing its delegated tasks in accordance with ERISA's fiduciary standards. The Lumen Defendants failed to prudently discharge their fiduciary duties in monitoring State Street.

210.    In the PRT industry, plan fiduciaries customarily solicit competitive bids from insurers to ascertain whether a proposed transfer is in the best interest of the plan participants. Given the extensive information available to Defendants that would have led a prudent fiduciary to reject Athene given its abominable creditworthiness and other deficiencies, it is evident that Defendants either did not solicit bids from a large number of providers and/or did not engage in

77

an independent and reasoned decision-making process prior to selecting and transferring pension benefits to Athene. Without such a reasoned, prudent, and objective decision-making process, Defendants could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of the Plan's participants and beneficiaries. Had Defendants engaged in the deliberative process that ERISA mandates, Defendants would have known that Athene was not the safest available annuity provider, and they would not have placed Plaintiffs' pension benefits and future retirement income payments at substantial risk of Athene's insolvency, incapacity, inability, or other unwillingness to perform.

211.    Defendants' decision to use Athene as the annuity provider harmed, and will continue to harm, Plaintiffs and other similarly situated Lumen retirees and beneficiaries over an extended period of time through uncompensated risk. The market measures Athene as up to 14% riskier than traditional annuity providers, including New York Life. Investors in the market demand a risk premium to compensate them for exposure to higher risk. But here, Plan participants and beneficiaries receive no additional compensation for taking on the additional risk of having their pension benefits offloaded to Athene.

212.    IB 95-1 expressly instructs fiduciaries that while the cost of the annuity will inevitably be considered, "cost consideration may not…justify purchase of an unsafe annuity." On information and belief, the Lumen Defendants received an economic benefit from choosing Athene in the form of reduced premium payments relative to what they would have paid to an established and reputable insurance provider, such as New York Life, to provide the same pension benefits to Plan participants. Lumen benefitted dollar-for-dollar from the savings resulting from the selection of Athene as the annuity provider, which was the direct result of Athene offering cheaper annuity

78

contracts and which was made possible by Athene's dangerous, high-risk strategies. Even if Athene's pricing had not been more favorable to Lumen than that of traditional annuity providers, no prudent fiduciary would select or cause to retain a riskier annuity if a safer annuity was available for the same price. Likewise, in accordance with IB 95-1, no prudent fiduciary would rely solely on Athene's credit ratings when determining the safest annuity provider available.

213. In addition, Lumen will profit from the transaction by saving on flat-rate and variable-rate premiums that it previously paid the PBGC to insure its retirees' benefits. Because of the transaction, Lumen and the Plan are no longer required to pay annual flat-rate PBGC premiums for the 22,600 participants terminated from the Plan.

214. Although State Street was nominally engaged by Lumen to provide independent fiduciary advice about selecting the safest annuity available in satisfaction of fiduciary obligations, State Street's true role was to give the appearance of legitimacy to their selection of Athene as an annuity provider.

215. State Street has financial incentives to advise plan sponsors to use Athene as the annuity provider in PRTs. State Street offers a financial product backed by Athene. State Street is also one of the largest shareholders of Apollo, Athene's parent company. And State Street provides custodial services for Athene's insurance products.

216. Given the corporate relationship between State Street and Athene, and the numerous factors that would lead to the rejection of Athene by a *bona fide* independent fiduciary, it is evident that State Street selected Athene without conducting a sufficiently independent and objective evaluation of available annuity providers or, alternatively, after ignoring apparent risks posed by Athene. The risk posed by Athene would have been known or ascertainable by any

prudent and loyal fiduciary. Without conducting an independent, impartial investigation aimed at identifying the safest annuity provider, State Street could not determine whether the use of Athene as the Plan's annuity provider was prudent or in the best interest of Plan participants.

217.    Based on this information and that available to sophisticated entities like Lumen and State Street, the selection of Athene was an imprudent decision, even if the selection of Athene had not led to an attendant economic benefit for Lumen and even if Athene's pricing was not more favorable to Lumen than that of a traditional annuity provider.

218.    As the number of PRT transactions has dramatically increased due to more firms entering the space, Milliman reported that the spread between average and competitive bids has widened, emphasizing the significant role of fiduciaries to ensure that low bidders are not taking undue risks. This wider range in premiums is shown below:



219.    Other sources confirm the trend of employers in PRT transactions selecting the lowest-cost annuity provider. Among partial buyouts completed in 2022, Aon reported that

employers (or plan sponsors) chose the lowest cost annuity in 78% of partial buyout transactions. As previously noted, the transaction at issue was a partial buyout.

220.    The Lumen Defendants' decision to choose State Street as an independent fiduciary for the Plan was itself a separate breach of the Lumen Defendants' fiduciary duties under ERISA. The Lumen Defendants had a motivation to favor State Street, one of Lumen's largest shareholders, in order to financially benefit themselves from the PRT transaction. State Street had the opportunity to use its significant market power to influence proxy voting outcomes to align with Lumen management on Lumen's shareholder resolutions. The Lumen Defendants had no interest in conducting an impartial investigation of available independent fiduciaries for the Plan.

221.    Accordingly, the Lumen Defendants either failed to engage in a thorough, independent investigation of available independent fiduciaries for the Plan, or ignored the results of such investigations, in express contravention of the duty to act solely and exclusively for the benefit of Plaintiffs and similarly situated Lumen retirees. Had the Lumen Defendants conducted an impartial investigation, they would have discovered that State Street was conflicted through its business dealings with Apollo and Athene, which impacted its ability to render independent fiduciary services.

## VII.    The PRT transaction diminished the value of Plaintiffs' pension benefits and substantially interfered with Plaintiffs' future payment rights.

222.    The PRT transaction with Athene immediately diminished the present value of Plaintiffs' and other similarly situated Lumen retirees. The transaction replaced valuable benefits to which Plaintiffs were entitled with substantially and quantifiably less valuable benefits. In the investment industry, risk is weighed by the market to determine the value of bonds or annuities. For a bond, the higher the risk, the greater return or spread required by the market. As such, if an

annuitant receives the same payments, but from a less creditworthy issuer, the annuitant experiences a loss. This is because the market assigns a lower price for an annuity issued by a riskier provider to cover a similar stream of future payment obligations to compensate the annuitant for the additional risk of future loss. The price (*i.e.*, present value) of future annuity payments is determined by the rate of return or discount rate. The higher the discount rate to compensate an annuitant for assuming additional risk of loss, the lower the present value of the annuity. The market measures Athene as up to 14% riskier than traditional annuity providers, including New York Life, and requires that level of higher yield for Athene debt.

223.    As of October 19, 2021, the value of Lumen retirees and beneficiaries' pension benefits and rights of future retirement payments is substantially less than it would be had Defendants selected a more traditional insurer of high credit quality. Because of these providers' high credit quality, they provide a greater likelihood that retirees will receive their full pension. If the Athene GAC at issue here were offered on the open market alongside traditional issuers' annuity products with identical terms and for the same price, then any rational retirement investor would choose any one of the traditional issuer's annuity products and would not choose Athene's. Alternatively, a rational retirement investor would insist on paying a lower price for the Athene-issued annuity, as its present value is substantially less than that of most other traditional, reputable, and stable annuity products. The diminution in present value of Plaintiffs and similarly situated Lumen retirees and beneficiaries' pension benefits as a result of Defendants' wrongful acts and omissions is substantial in dollar terms.

224.    It is a basic proposition that riskier assets are, all else equal, worth less than safer assets. For instance, the Athene 10- and 20-year annuities had a higher credit spread relative to

82

U.S. Treasuries than those issued by other insurers. Because of their higher credit spread, Athene annuities in turn have higher risk relative to annuities offered by other insurers. That was also true when Defendants undertook PRT. Thus, the annuities from Athene are worth measurably less than the annuities would be worth if issued by another insurer.

225.   Before the Lumen-Athene-State Street transaction, the risk that Plaintiffs would not receive the pension benefits to which they were entitled was negligible. There was no realistic probability that the Plan would not be sufficiently funded to pay the benefits and that Lumen would fail and that the PBGC—which has billions of dollars of cash on hand and which is effectively backed by the federal government—would fail to pay Plaintiffs' benefits. There was no safer place for their pension benefits.

226.   After the transaction, the risk that Plaintiffs will not receive the benefits to which they are entitled is substantial. Because of the transaction, Plaintiffs are no longer members of the Plan, and their retirement benefits are no longer backed by the Plan, Lumen, or the PBGC. The pension benefits were safer in the hands of Lumen or the PBGC, and thus, the risk assumed by Plaintiffs and other Lumen retirees is greater than the difference in the risk between Athene and traditional annuity providers. Based on Athene's current and likely future financial position, there is a substantial probability that it will fail to make good on its obligation to pay Plaintiffs' retirement benefits, and the profit realized by Lumen is at least a rough proxy for the harm to retirees from being terminated as plan participants and having their pension benefits secured through a risky annuity with Athene. The PRT transaction thus greatly increased the risk—and indeed introduced a substantial risk—that Plaintiffs will not receive the retirement benefits they earned and are owed. Defendants' selection of Athene injured Plaintiffs the very moment the

transaction was consummated because, at that moment, the present material economic value of Plaintiffs' promised benefits was substantially and quantifiably diminished.

227. Had Defendants not engaged in the acts and omissions alleged to be unlawful herein, Plaintiffs would not have been injured because: (1) the present value of their pension benefits (including the right of future retirement income payments) would not have been substantially diminished; and (2) even if Lumen had at some point in the future become unable or unwilling to honor its obligations, the PBGC would have served as the backstop to mitigate Plaintiffs' losses. Plaintiffs are therefore empowered to bring their claims under 29 U.S.C § 1104(a)(2), (a)(3), and (a)(9).

<b>CLASS ACTION ALLEGATIONS</b>

228. Plaintiffs seek class action certification on behalf of all participants in the Lumen Combined Pension Plan (f/k/a CenturyLink Combined Pension Plan) and their beneficiaries since October 19, 2021, for whom the responsibility for plan-related benefit payments has been transferred to Athene Annuity and Life Co. or Athene Annuity & Life Assurance Company of New York.

229. This action meets the requirements of Rule 23 and is certifiable as a class action for the following reasons:

a. The proposed class includes approximately 22,600 members and is so large that joinder of all its members is impracticable.

b. There are questions of law and fact common to the proposed class, the resolution of which will resolve the validity of all class members' claims, including whether Defendants violated ERISA in connection with the transactions and, if so, the appropriate

84

remedy for any violation. Plaintiffs' claims are typical of the claims of the class because all Plaintiffs and all class members were participants in the Plan and were subjected to Defendants' conduct in transferring Lumen's benefit payments to the Athene entities, and seek to redress the same legal violations, as the class's claims.

c.      Plaintiffs are adequate representatives of the proposed class because they are committed to the vigorous representation of the class and prosecution of this action, have engaged experienced and competent attorneys to represent the class, and have no conflicts of interest with members of the proposed class.

d.      The claims herein satisfy the requirements of Rule 23(b)(1) because prosecuting separate actions by individual class members would create a risk of (A) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants with respect to their obligations to the Plan and members of the proposed class and (B) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duty and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries not parties to the adjudication or would substantially impair or impede those participants' and beneficiaries' ability to protect their interests. Therefore, this action should be certified as a class action under Rule 23(b)(1)(A) or (B).

e.      The claims herein also satisfy the requirements of Rule 23(b)(2) because Defendants acted or refused to act in the same manner generally to the class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.

85

Individual class members' claims are identical and the injunctive relief sought will affect each class member equally.

       f.      Alternatively, the claims herein satisfy the requirements of Rule 23(b)(3) because common questions of law and fact predominate over individual questions and a class action is superior to individual actions or other methods of adjudication. Given the nature of the allegations and Defendants' common course of conduct to the class as a whole, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are aware of no difficulties likely to be encountered in the management of this matter as a class action.

230.    Plaintiffs' counsel, Schlichter Bogard LLC, will fairly and adequately represent the interests of the class and is best able to represent the interests of the class under Rule 23(g). The firm has extensive experience in the area of ERISA fiduciary breach litigation and has been appointed class counsel in over 40 ERISA fiduciary breach actions since 2006. The firm is recognized "as a pioneer and the leader in the field" of ERISA retirement plan litigation, *Abbott v. Lockheed Martin Corp.*, No. 06-701, 2015 U.S. Dist. LEXIS 93206, at *4–5 (S.D. Ill. July 17, 2015), and "clearly experts in ERISA litigation." *Tussey v. ABB, Inc.*, No. 06-4305, 2012 U.S. Dist. LEXIS 157428 at 10 (W.D. Mo. Nov. 2, 2012). The firm's work in ERISA class actions has been featured in the New York Times, Wall Street Journal, NPR, Reuters, and Bloomberg, among other media outlets. *See, e.g.*, Anne Tergesen, *401(k) Fees, Already Low, Are Heading Lower*, WALL ST. J. (May 15, 2016); Gretchen Morgenson, *A Lone Ranger of the 401(k)'s*, N.Y. TIMES (Mar. 29, 2014); Liz Moyer, *High Court Spotlight Put on 401(k) Plans*, WALL ST. J. (Feb. 23, 2015); Floyd Norris, *What a 401(k) Plan Really Owes Employees*, N.Y. TIMES (Oct. 16, 2014); Sara Randazzo,

86

*Plaintiffs' Lawyer Takes on Retirement Plans*, WALL ST. J. (Aug. 25, 2015); Jess Bravin and Liz Moyer, *High Court Ruling Adds Protections for Investors in 401(k) Plans*, WALL ST. J. (May 18, 2015); Jim Zarroli, *Lockheed Martin Case Puts 401(k) Plans on Trial*, NPR (Dec. 15, 2014); Mark Miller*, Are 401(k) Fees Too High? The High-Court May Have an Opinion*, REUTERS (May 1, 2014); Greg Stohr, *401(k) Fees at Issue as Court Takes Edison Worker Appeal*, BLOOMBERG (Oct. 2, 2014).

### COUNT I

### Breaches of Fiduciary Duty against all Defendants Regarding Athene

231.    Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

232.    Each Defendant acted as a "fiduciary" as defined by ERISA with respect to the Plan and transactions at issue.

233.    As such, Defendants were required to discharge their duties with respect to the Plan "solely in the interest of" and "for the exclusive purpose of providing benefits to" the Plan's participants and beneficiaries and defraying reasonable expenses of administering the Plan, and "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(A)–(B).

234.    IB 95-1 sets forth the Department of Labor's view of the legal standard imposed by § 1104(a)(1)(A) and (B) as it relates to a fiduciary's selection of an annuity provider in connection with a pension risk transfer. 29 C.F.R. § 2509.95-1. Among other requirements, to fulfill the duties to act solely in the interest of participants and for the exclusive purpose of providing benefits, fiduciaries generally must take steps calculated to obtain "the safest annuity available." Fulfilling

87

the duty of prudence requires an objective, thorough, and analytical search for an annuity provider. This is confirmed by case law adopting a materially similar standard and holding that the fiduciary must take steps to conduct a thorough and impartial investigation designed to identify and hire the provider that "best promotes participants' and beneficiaries' interests" in the security of their pensions, without regard to cost. *Bussian v. RJR Nabisco, Inc.*, 223 F.3d 286, 302 (5th Cir. 2000).

235.    Defendants breached their duties of prudence and loyalty. Both on objective criteria and relative to other providers in the market for plans of the character and size of the Plan, Athene was not the safest annuity available, nor was it the provider that would best promote the interests of the transferees. On information and belief, Defendants selected Athene not because doing so was in the interest of participants, their beneficiaries, and the security of their retirement benefits, but to advance corporate interests by saving Lumen money and enhancing corporate profits. In so doing, Defendants breached their duty of loyalty by favoring corporate interests over the participants' interests in a secure retirement. Because Defendants' goal and motivation was to save Lumen money, Defendants' search was biased in favor of the lowest-cost provider and thus not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

236.    State Street was conflicted, and its selection or recommendation of Athene was influenced by its relationships with Lumen, Athene, and Athene's affiliates rather than being the result of an objective and thorough independent investigation into the merits of whether Athene was the safest annuity provider available. In so doing, Defendants breached their duty of loyalty by favoring their own corporate interests over Plan participants' interests in a secure retirement. Because the Lumen Defendants' goal and motivation was to save Lumen money, and State Street's goal and motivation was to benefit itself and its corporate partners, Defendants' search was biased

in favor of the lowest-cost provider and thus was not objective or sufficiently thorough or analytical, thereby breaching the duty of prudence.

237.    The harm suffered by Plaintiffs and class members from these breaches of fiduciary duty includes an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk. Plaintiffs must also be compensated for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace.

238.    Defendants are subject to appropriate relief to remedy these breaches of fiduciary duty, including without limitation disgorgement of all ill-gotten profits/cost savings realized by Defendants by virtue of purchasing Athene annuities instead of the safest possible annuities and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

239.    Based on the facts alleged herein, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a) because the alleged facts show that each Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants, or failed to make any reasonable effort under the circumstances to remedy the breach.

## COUNT II

### Knowing Participation in Fiduciary Breaches against the Lumen Defendants

240.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

89

241.    An individual whose status as a participant or beneficiary is terminated in a plan through the purchase of an insurance contract or annuity may bring an action to obtain appropriate relief when such purchase constitutes a violation of 29 U.S.C. § 1104. Section 1132(a)(9) places substantive duties on certain nonfiduciaries and imposes liability on nonfiduciaries who knowingly participate in a fiduciary breach under § 1104. 29 U.S.C. § 1132(a)(9).

242.    Under 29 U.S.C. § 1132(a)(3), a court may award appropriate equitable relief to redress violations of ERISA. While certain ERISA provisions impose liability on fiduciaries only, § 1132(a)(3) "admits of no limit . . . on the universe of possible defendants." *Harris Tr. & Sav. Bank*, 530 U.S. at 246.

243.    Section § 1132(a)(9) allows a court to order appropriate relief to remedy a PRT that violates ERISA, and also admits of no limit on the universe of possible defendants.

244.    Plaintiffs allege that, even if any of the Lumen Defendants did not act as fiduciaries with respect to the selection of Athene, then in the alternative to Count I, such Defendants are liable under §§ 1132(a)(3) and 1132(a)(9) for their knowing participation in the breach of the fiduciaries who selected Athene. Each of these Defendants knew of the circumstances that rendered the responsible fiduciary's conduct a breach of fiduciary duties. These Defendants knew that the responsible fiduciary's investigation of available annuity providers was not objective or sufficiently thorough. These Defendants also knew that the Lumen Defendants' selection of State Street instead of a truly independent fiduciary, or State Street's deficient selection/ recommendation of Athene instead of a prudent alternative annuity provider, would generate a massive monetary benefit for the Lumen Defendants, and then knowingly accepted that benefit. And they knew that the purchase of Athene annuities involved facts constituting transactions prohibited by § 1106.

**COUNT III**

**Prohibited Transaction against the Lumen Defendants for Hiring State Street**

245.    Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

246.    ERISA supplements the general fiduciary duties by categorically prohibiting certain transactions. 29 U.S.C. § 1106(a)(1), (b).

247.    Section 1106(a) prohibits various transactions between a plan and a "party in interest," which Congress defined to encompass "those entities that a fiduciary might be inclined to favor at the expense of the plan beneficiaries," *Harris Tr. & Sav. Bank*, 530 U.S. at 242, such as employers, other fiduciaries, and service providers. 29 U.S.C. § 1002(14)(A)–(C).

248.    Section 1106(b) categorically prohibits a fiduciary from engaging in certain transactions with a plan, which often involve self-dealing.

249.    State Street was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). The Lumen Defendants knowingly caused the Plan to engage in a transaction resulting in a direct or indirect furnishing of services between the Plan and State Street. 29 U.S.C. § 1106(a)(1)(C).

250.    The Lumen Defendants entered into a prohibited transaction when they engaged State Street as the Plan's independent fiduciary, which facilitated the subsequent selection of Athene and harmed Plaintiffs and class members.

251.    The transaction at issue does not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to

participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

252. By using pension trust assets to pay State Street – a party in interest that was not independent – the Lumen Defendants dealt with the assets of the Plan in their own interest or for their own account, and acted on behalf of a party whose interest in using a riskier, lower-cost annuity provider was averse to the interests of the Plan participants and their beneficiaries in obtaining the safest possible annuity. 29 U.S.C. § 1106(b)(1)–(2).

253. Each Lumen Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by virtue of engaging State Street instead of a truly independent fiduciary and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

254. Each Lumen Defendant knowingly participated in the breach of the other Lumen Defendants, knowing that such acts were a breach, enabled the other Lumen Defendants to commit a breach by failing to lawfully discharge his, her, or its own fiduciary duties, knew of the breach by the other Lumen Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Lumen Defendant is liable for the losses caused by the breach of his, her, or its co-fiduciary under 29 U.S.C. § 1105(a).

255. Even if the Lumen Defendants did not act as fiduciaries over the selection of State Street, each Lumen Defendant is still liable as a nonfiduciary party in interest who knowingly participated in a prohibited transaction committed by another fiduciary. A nonfiduciary transferee of ill-gotten proceeds is subject to appropriate equitable relief if it had actual or constructive

92

knowledge of the circumstances that rendered the transaction unlawful. The Lumen Defendants had actual or constructive knowledge that engaging State Street – a party in interest – as an "independent" fiduciary was unlawful, and thus knew or should have known that the other fiduciary was engaged in an unlawful transaction by causing the Plan to transfer assets intended to fund the Plaintiffs' pension benefits to State Street, for State Street's immediate profit.

COUNT IV

**Prohibited Transaction(s) against all Defendants for Engaging in Transaction(s) with Athene**

256. Plaintiffs restate and incorporate the allegations in the preceding paragraphs.

257. Athene was a party in interest because it provided services to the Plan. 29 U.S.C. § 1002(14)(B). Defendants knowingly caused the Plan to engage in the transaction(s) with Athene with actual or constructive knowledge that the transaction(s) constituted direct or indirect (i) exchange of property between the Plan and Athene; (ii) furnishing of services between the Plan and Athene; and (iii) transfer to, or use by or for the benefit of Athene, of Plan assets, *see* 29 U.S.C. § 1106(a)(1)(A), (C), (D).

258. The transactions at issue do not qualify for any exemption from the prohibitions of § 1106(a). Among other reasons, given the substantial risk that Athene's retention posed to participants' retirement benefits, Athene received more than reasonable compensation for its services to the Plan.

259. Each Defendant is subject to appropriate relief to remedy these prohibited transactions, including disgorgement of all ill-gotten profits/cost savings realized by the Defendants by virtue of purchasing Athene annuities instead of the safest available annuity and by State Street by virtue of selecting or recommending Athene annuities instead of the provider with

the highest claims-paying ability and the posting of security to assure receipt by Plaintiffs and class members of their full retirement benefits, plus prejudgment interest. *See* 29 U.S.C. §§ 1109(a), 1132(a)(2), 1132(a)(3), 1132(a)(9).

260. Defendants knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants' commission of a breach by failing to lawfully discharge their fiduciary duties, knew of the breach by the other Defendants, and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, they are liable for the losses caused by the breach of their co-fiduciaries under 29 U.S.C. § 1105(a), and would be liable even if they were deemed nonfiduciaries.

**COUNT V**

**Failure to Monitor Fiduciaries against the Lumen Defendants**

261. Plaintiffs restate and incorporate the allegations contained in the preceding paragraphs.

262. The Lumen Defendants had a fiduciary responsibility to oversee the Plan, including the monitoring of any other fiduciaries appointed or hired to manage the Plan on a day-to-day basis, and the day-to-day responsibility to select service providers, such as an annuity provider.

263. A monitoring fiduciary must ensure that those to whom its fiduciary duties are delegated are performing their delegated duties in compliance with ERISA's fiduciary standards. The Lumen Defendants breached their fiduciary monitoring duties by failing to ensure that the process of selecting Athene as an annuity provider complied with the fiduciary standards set forth in 29 U.S.C. §§ 1104(a)(1)(A)–(B), 1132(a)(9), and 29 C.F.R. § 2509.95-1.

264. Had the Lumen Defendants fulfilled their fiduciary monitoring duties, Athene would have been rejected in favor of the safest possible annuity or Defendants would have decided not to proceed with the transaction. As a result of these monitoring failures, Plaintiffs and class members suffered harm, including an increased and significant risk that they will not receive the benefit payments to which they are entitled and a decrease in value of their pension benefits due to uncompensated risk.

### JURY TRIAL DEMANDED

265. Pursuant to Fed. R. Civ. P. 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury on all issues so triable in this action and, alternatively, an advisory jury.

### PRAYER FOR RELIEF

Based on the foregoing, Plaintiffs, on behalf of the proposed class of similarly situated Plan participants and beneficiaries, respectfully request that the Court:

- Find and declare Defendants have breached their fiduciary duties and caused the prohibited transactions described above;

- Order disgorgement of all sums derived from the improper transaction;

- Order Defendants to compensate class members for the losses associated with the monetary value of the additional risk of their Athene annuities as demonstrated by the marketplace;

- Issue an affirmative injunction ordering Defendants to guarantee the annuities purchased from Athene through the purchase, at their expense, of satisfactory guarantees from reliable insurers selected through appropriate procedures, or to

95

post adequate security to assure receipt by Plaintiffs and class members of all

retirement benefits covered by the Athene annuities, plus prejudgment interest;

- Certify the proposed class, appoint each Plaintiff as a class representative, and

  appoint Schlichter Bogard LLC as Class Counsel;

- Award to the Plaintiffs and the class their attorney's fees and costs under 29

  U.S.C. § 1132(g)(1) and the common fund doctrine;

- Order the payment of interest to the extent it is allowed by law; and

- Grant any other relief as the Court deems appropriate to remedy the ERISA

  violations.

November 5, 2025                          Respectfully submitted,


                                          /s/ Sean E. Soyars
                                          Sean E. Soyars
                                          Kurt C. Struckhoff
                                          Jerome J. Schlichter
                                          Patrick R. Kutz
                                          SCHLICHTER BOGARD LLC
                                          100 South Fourth Street, Suite 1200
                                          St. Louis, Missouri 63102
                                          Telephone: +1 (314) 621-6115
                                          Facsimile: +1 (314) 621-5934
                                          ssoyars@uselaws.com
                                          kstruckhoff@uselaws.com
                                          jschlichter@uselaws.com
                                          pkutz@uselaws.com

                                          Admitted to the District of Colorado

                                          *Counsel for Plaintiffs & the Proposed Class*